**UNITED STATES, ex rel. Jean–Francois TRUONG, Curtis Dane, Plaintiffs,**

v.

**NORTHROP CORPORATION, a California corporation, Defendant.**

**No. CV 88–967 MRP.**

United States District Court, C.D. California.

Aug. 11, 1989.

---

PFAELZER, District Judge.

In this action, plaintiffs allege that the officers, employees and agents of Northrop Corporation's Advanced Systems Division conspired to obtain fraudulently, through the preparation of false records and statements and the collaborative omission and suppression of material facts, payments of false claims in connection with the design and manufacture of the "B-2" or "Stealth" bomber. The suit is brought under the False Claims Act ("the Act"), 31 U.S.C.A. §§ 3729 *et seq.* (West Supp.1988), by *qui tam* relators suing on behalf of the government. Northrop now moves to dismiss the action under F.R.Civ.P. 12(b)(1) on the ground that the *qui tam* provisions of the statute are unconstitutional under Article III, the separation of powers doctrine, and the Appointments Clause of Article II.

## DISCUSSION

### I. *The Statute*

The False Claims Act was originally enacted in 1863 and has been twice amended, first in 1943 and again in 1986. Under all versions of the Act, individuals have been authorized to "bring a civil action for a violation of [the Act] for the person and for the United States Government." 31 U.S.C.A. § 3730(b)(1) (West Supp.1988).

Briefly stated, the statute as now amended specifies the following procedure with respect to *qui tam* actions: The plaintiff must file his complaint *in camera* where it will remain under seal for at least 60 days to allow the government sufficient time to decide whether or not to enter the action. *Id.* § 3730(b)(2) (West Supp.1988). If the government decides not to join the action—as in the instant case—the action will nonetheless proceed in its behalf at the direction of the relator. *Id.* § 3730(b)(4)(B) (West Supp.1988). The government may, however, intervene at a later date upon a showing of "good cause". *Id.* § 3730(c)(3) (West Supp.1988).

If the government does intervene, it assumes primary responsibility for the prosecution, "and shall not be bound by an act of the person bringing the action." *Id.* § 3730(c)(1) (West Supp.1988). The relator continues, however, to be a party to the action and his participation may be limited only by order of the court. *Id.* §§ 3730(c)(2)(C)–(D), 3730(c)(4) (West Supp. 1988).

Whether or not the government joins in the suit, the *qui tam* plaintiff is entitled to a portion of the proceeds if the prosecution is successful. If the government does participate, the relator will receive no less than 15 and no more than 25 percent of the bounty. *Id.* § 3730(d)(1) (West Supp.1988). If the government does not join, recovery is set at 25 to 30 percent. *Id.* § 3730(d)(2) (West Supp.1988).

### II. *Standing*

To have standing under Article III, a plaintiff must show actual or threatened injury that is likely to be redressed if the

requested relief is granted. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979). This injury must be concrete, *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974), to ensure that the litigant has a personal stake in the outcome of the litigation. *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). The purpose of this requirement is to ensure "that concrete adverseness which sharpens the presentation of issues." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), citing *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Vigorous litigation, however, "is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 486, 102 S.Ct. 752, 766, 70 L.Ed.2d 700 (1982) (emphasis added). To this end, while Congress may confer standing statutorily, it may not waive the constitutional minimum of injury in fact. *Id.* at 487–88 n. 24, 102 S.Ct. at 766–67 n. 24.[1]

In accordance with this standard, the courts have refused to recognize the standing of private parties to seek review of the conduct of the executive branch where such individuals have failed to make a showing of personal injury. *See, e.g., Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (claim that IRS regulations governing tax-exempt status of racially discriminatory schools were inadequate); *Valley Forge*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (challenge to Department of Health, Education & Wel-

fare's grant of federal land to religious entity); *Schlesinger*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (challenge to status of Congresspersons as officers in Armed Forces Reserve); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (challenge to Interior Secretary's approval of commercial skiing development); *but see Natural Resources Defense Council, Inc., v. EPA*, 507 F.2d 905, 910 (9th Cir.1974) (fact that citizen breathed the air was sufficient to give him standing to seek review of EPA approval of state implementation plan under Clean Air Act).

Underlying these decisions is the concern that the judicial branch refrain from issuing advisory opinions where the plaintiff has alleged only "abstract injury in nonobservance of the Constitution." *Allen*, 468 U.S. at 754, 104 S.Ct. at 3326 (quoting *Schlesinger*, 418 U.S. at 223 n. 13, 94 S.Ct. at 2933 n. 13). In the instant case, by contrast, the alleged injury is not abstract; the fraud which is alleged is fact specific and the damages owing to the government are readily calculable.[2] The court, moreover, is not called upon to interpret the Constitution. It simply must determine whether the statute has been violated, what damages the government has suffered, and the share of the award to which the relator is entitled.

The defendant does not dispute the existence of injury to the government, but contends that the absence of injury in fact to the *qui tam* plaintiffs denies them standing. Plaintiffs have proffered a number of arguments against the application of the injury-in-fact standard to the relator, the first of which is historical. They contend that since *qui tam* actions were authorized in a number of statutes enacted by the First Congress,[3] it is axiomatic that the

1. *See, e.g., McClure v. Carter*, 513 F.Supp. 265 (D.Idaho 1981), *aff'd without op. sub nom. McClure v. Reagan*, 454 U.S. 1025, 102 S.Ct. 559, 70 L.Ed.2d 469 (1981) (striking down statute giving any member of Congress the right to challenge judicial appointment after Senate confirmation on ground that legislator's interest in maintaining effectiveness of his vote was insufficient to confer standing).

2. The complaint alleges, to this end, that Northrop fraudulently inflated production costs for the B–2 Bomber by $300 million to $700 million per unit, for a total in excess of $50 billion.

3. Six statutes expressly authorized suits by private informers, with the recovery being shared between the informer and the government. *See* Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (marshals' misfeasance in census taking); Act of

Framers did not perceive any Article III violation. Moreover, while the constitutionality of this and other *qui tam* statutes has never been squarely addressed by the Supreme Court, Justices Frankfurter and Harlan, who had a generally restrictive view of Article III, intimated that these statutes presented no problems of standing. *See Flast v. Cohen*, 392 U.S. at 120, 88 S.Ct. at 1963 (Harlan, J., dissenting); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 418, 68 S.Ct. 123, 92 L.Ed. 32 (1947) (Frankfurter, J., dissenting). Additionally, various federal courts have indicated, either directly or impliedly, that the False Claims Act passes constitutional muster.[4]

The Court does not find this historical argument persuasive. With the exception of *Bounty Hunters*, the cases cited by Northrop were decided prior to the evolution of modern standing doctrine. Thus, they are of limited use here. More fundamentally, the fact that *qui tam* statutes date back to the time of the First Congress is not independent evidence of their constitutionality. *Marbury v. Madison*, 5 U.S. 137, 2 L.Ed. 60 (1803), for example, held § 13 of the Judiciary Act, a statute passed by the First Congress, to be unconstitutional. *See also Wallace v. Jaffree*, 472 U.S. 38, 100, 105 S.Ct. 2479, 2512, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (federal aid to sectarian schools viewed as unconstitutional despite fact that First Congress granted similar aid); *Marsh v. Chambers*, 463 U.S. 783, 814 n. 30, 103 S.Ct. 3330, 3347, 77 L.Ed.2d 1019 (1983) (Brennan, J., dissenting) (cautioning reliance on historical arguments and referring, by way of

example, to First Congressional statute requiring public whipping of slaves, which is presumably unconstitutional today).

As an analogue to their historical argument, plaintiffs contend that today, as in 1863 when the False Claims Act was first enacted, the government has insufficient time and resources to prosecute fraud even when officials have been able to detect it. Thus, under these circumstances, Congress has determined that the best way to allocate its limited resources is to "deputize ready and able people who have knowledge of fraud against the government to play an active and constructive role through their counsel to bring to justice those contractors who overcharge the government." 132 Cong.Rec. H9388 (daily ed. Oct. 7, 1986) (Rep. Berman).

While the paucity of government resources is a legitimate justification for authorizing private enforcement of the False Claims Act as a policy matter, it is insufficient in and of itself to confer Article III standing on a private party. Otherwise, the government could enlist a veritable army of private deputies to enforce its rights under a variety of statutes pursuant solely to a declaration that it did not have the resources to do so itself. There is no authority under Article III for such action. The tenuousness of the historical and resource-based arguments is, however, of no practical consequence for Article III purposes in light of the very clear demonstration of injury to the government and of the relator's personal stake in the litigation.

■ Where, as here, the presence of injury to the government is not disputed, the

July 5, 1790, ch. 25, § 1, 1 Stat. 129 (same); Act of July 20, 1790, ch. 29, § 4, 1 Stat. 131, 133 (harboring runaway mariners); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 137–38 (unlicensed Indian trade); Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 191, 195–96 (unlawful loans by subscribers to Bank of United States); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (avoidance of liquor import duties). Three others permitted informers to keep the entire recovery. *See* Act of July 31, 1789, ch. 5, § 29, 1 Stat. 29, 44–45 (import duty collectors' failure to post accurate rates); Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60 (failure to register vessels properly); Act of Aug. 4, 1790, ch. 35, § 55, 1 Stat. 145, 173

(import duty collectors' failure to post accurate rates).

**4.** Two courts have addressed the standing issue directly. *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460 (5th Cir.1977); *Public Interest Bounty Hunters v. Board of Governors of the Federal Reserve System*, 548 F.Supp. 157, 161 (N.D.Ga.1982). The Supreme Court was not called upon to do so but did note that *qui tam* actions "have been frequently permitted by legislative action, and have not been without defense by the courts." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541, 63 S.Ct. 379, 383, 87 L.Ed. 443 (1943).

application of the injury-in-fact standard to the *qui tam* plaintiff[5] would be purely mechanical. Moreover, such an application would not be consistent with the underlying purpose of Article III which, as stated, is to ensure the genuine adverseness of litigation. *See, e.g., Baker v. Carr*, 369 U.S. at 199, 82 S.Ct. at 700. Where there is evidence of palpable injury to the entity on whose behalf and in whose name the suit is brought,[6] it is superfluous to require that the relator be individually aggrieved.[7]

Whenever it takes prosecutorial action, the government is obliged to designate some party to act on its behalf. Typically, this responsibility is assigned to attorneys within the Department of Justice or to one of the executive agencies, but this is not always the case. For example, under the recently enacted Federal Debt Collections Practices Act, 31 U.S.C.A. § 3718 (West 1983 & Supp.1988), and Farm Credit Amendments Act, 12 U.S.C.A. § 2244(c) (West Supp.1988), private citizens may be hired to augment government enforcement efforts. In these instances, as with the False Claims Act, standing is based on the existence of a clearly defined, adversarial relationship between the government and the defendant, not between the defendant

and the United States' particular legal representative.

In authorizing private prosecutorial action on the government's behalf in the False Claims Act and the other statutes mentioned above, Congress is making a policy decision based on its perception of how best to serve the public interest. By adjudicating these statutory claims, the judicial branch is in essence implementing this legislative definition of the public interest. Recognition of "citizen" standing involves, by contrast, the development of causes of action for plaintiffs in consideration of what, in the courts' opinion, would best advance the public interest. While there may be differing points of view as to whether the court has engaged in policymaking in a particular case, it is certainly clear that the policymaking function is not assigned to the judicial branch. *See Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985). The requirement that citizen plaintiffs demonstrate injury in fact may thus be viewed as doctrine designed to preclude the judiciary from exercising what are essentially executive and legislative functions.[8]

In the instant case, the judicial branch is not called upon to create causes of actions

---

**5.** Plaintiffs have in fact argued that the relator is injured in three different ways. The Court finds none to be persuasive. The first, the potential denial of the statutory bounty, cannot qualify as injury in fact since there is no entitlement to the award. The remaining two, the potential jeopardy to the relator's employment status upon disclosure and the possibility of his exposure to future litigation in the event of non-disclosure, fail on two grounds. First, they lack the requisite "nexus to the substantive character of the statute," being more in the nature of ancillary or collateral concerns. *Diamond v. Charles*, 476 U.S. 54, 70, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986). Second, they do not constitute "actual" or "threatened" injury but are more appropriately classified as "speculative harm," which is insufficient evidence of injury in fact. *See Gladstone*, 441 U.S. at 99–100, 99 S.Ct. at 1607–08; *Schlesinger*, 418 U.S. at 220–22, 94 S.Ct. at 2925–27.

**6.** The statute does, however, allow a *qui tam* plaintiff to conduct litigation on the government's behalf where the latter does not hold a good faith belief that it has been injured. As currently constituted, the statute requires only that the government state its intention to join or not to join in the suit; it need not specify the

basis for its decision. Therefore, this procedure permits a suit to go forward which the government believes to be without merit. In such instances, the plaintiff is, in essence, a "straw man." The statute could have been constructed so as to avoid this difficulty by, for example, requiring that the government notify the Court in writing when it declines to join a False Claims action because it does not believe that the claims raised are meritorious.

**7.** To the extent that the relator must have a "personal stake" in the outcome of the litigation, the bounty to which he is entitled if victorious is sufficient. This statutorily-prescribed recovery is distinguishable from attorney's fees, which the Court determined did not create a judicially cognizable interest, since the former "bears no relation to the statute whose constitutionality is at issue." *Diamond v. Charles*, 476 U.S. 54, 70, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986).

**8.** At this point, the analysis of the standing issue dovetails with that of separation of powers doctrine addressed in section two of this memorandum.

or make any policy determinations. There is a concrete, identifiable claim for fraud against the government the prosecution of which Congress, pursuant to its policymaking authority, has placed under the direction of the *qui tam* relator. As the court need only enforce the policy under the congressionally defined substantive law, it is unnecessary to require that the relator demonstrate injury in fact to comply with Article III. Accordingly, and in sum, Northrop's contention that the *qui tam* plaintiffs lack standing to bring the instant action is without merit.

III. *Separation of Powers*

Even if the amended False Claims Act satisfies Article III, Northrop contends that it violates the doctrine of separation of powers by unconstitutionally undermining the authority of the executive branch. The Court does not agree.

A. *General Principles*

The separation of powers doctrine does not require a "hermetic division" between the branches but is intended instead to achieve a Madisonian system of checks and balances characterized by "separateness but interdependence, autonomy but reciprocity." *Mistretta v. U.S.*, 488 U.S. 361, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989) (quoting *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)); *see also Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988). In short, the doctrine acts as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of [an]other." *Buckley v. Valeo*, 424 U.S. 1, 122, 96 S.Ct. 612, 683–84, 46 L.Ed.2d 659 (1976). Thus, where the functions of two coordinate branches are commingled without encroachment or aggrandizement, there is no constitutional violation. *See, e.g., Mistretta*, 109 S.Ct. 647 (Congressional creation and placement of Sentencing Commission in judicial branch is constitutional); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (agency's assumption of

jurisdiction over adjudication of state law counterclaim does not undermine judicial branch authority).

The recent case of *Morrison v. Olson* indicates the extent to which litigative authority may be commingled between branches. In that case, the Supreme Court considered a separation of powers challenge to the independent counsel provisions of the Ethics in Government Act of 1978. The Act created a "Special Division" of the federal court of appeals for the District of Columbia which was empowered to appoint an independent counsel and define his prosecutorial jurisdiction.

In turning back the challenge, the Court held that the Act did not unduly concentrate authority in one branch or undermine the authority of a coordinate branch. First, since Congress retains no control or supervision of the counsel, there can be no danger of Congressional usurpation of executive power. 108 S.Ct. at 2621. Likewise, the judicial branch cannot be seen as encroaching on the executive since it is the Attorney General who decides whether or not to seek the appointment of an independent counsel and his decision is unreviewable; while the judicial branch is responsible for appointing the counsel and defining his jurisdiction, these powers "are not supervisory or administrative, nor are they functions that the Constitution requires be performed by officials within the Executive Branch." *Id.* Finally, the Act does not undermine the executive branch's accomplishment of its constitutionally assigned functions since the Attorney General retains significant control over the independent counsel. To this end, the Court noted (a) that the Attorney General may remove a counsel for good cause, (b) that the Attorney General controls the initiation of litigation since no counsel may be appointed absent an application made by him, and (c) a counsel's jurisdiction is determined with reference to the facts submitted by the Attorney General. *Id.* In light of the foregoing, the Court concluded that

[n]otwithstanding the fact that the counsel is to some degree "independent" and free from Executive supervision to a

greater extent than other federal prosecutors, in our view these features of the Act give the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties. *Id.* at 2622.

■ Thus, under *Morrison v. Olson,* for the *qui tam* provisions of the False Claims Act to pass constitutional muster, the executive branch must retain "sufficient"—as against absolute or total—control over the litigation. Therefore, the specific provisions of the Act must be examined to determine whether the executive's litigative function has been impermissibly undermined or usurped by another branch. This discussion is best divided into three sections representing the three phases of the litigative process.

### B. *False Claims Litigation*
#### 1. Phase One: Initiating the Suit

While the statute allows suit to be brought in the government's name without its consent,[9] it can hardly be said that the Attorney General is in any way at the mercy of either the *qui tam* plaintiff or the judicial branch. The government alone has absolute discretion to join the suit.[10] If, moreover, the government files the action first, a relator is jurisdictionally barred from bringing any action based on the same underlying facts. 31 U.S.C.A. § 3730(e)(3) (West Supp.1988). Even if the government has not filed suit but has made public the findings of an investigation, a private party may not sue unless he is an original and independent source of the information on which the complaint is based. *Id.* § 3730(e)(4)(A)-(B) (West Supp.1988).

The only potential judicial involvement at the initiation of litigation occurs if the government seeks to extend the 60–day investigative period. The government's burden in showing "good cause" for the extension is not particularly onerous and,

more importantly, it does not involve any encroachment on the executive function.

#### 2. Phase Two: Conducting the Litigation

In essence, there are three areas of concern with respect to the relator's role in the conduct of the litigation: (1) If the government elects not to intervene, the *qui tam* plaintiff directs the prosecution which nonetheless proceeds in the government's name; (2) if, at a later date, the government changes its mind, it may intervene only with permission of the court pursuant to a showing of "good cause;" (3) if, moreover, a dispute arises at any time between the relator and the government as to the conduct of the suit, the government must ask the court to limit the former's participation; the Attorney General does not himself have the authority to limit the relator's role.[11]

Realistically, some of these concerns are not very significant. While it is true that the plaintiff can continue to prosecute a case in the absence of the government—as in the instant case—the government is not precluded from later litigating the same issue with different parties or relating to different facts. *Cf. U.S. v. Stauffer Chemical Co.,* 464 U.S. 165, 173–74, 104 S.Ct. 575, 580, 78 L.Ed.2d 388 (1984). In addition, even if the government chooses not to intervene at the outset, it may nonetheless elect to receive all pleadings and deposition transcripts so that it may monitor the progress of the litigation and apply for intervention in the event that it determines that the *qui tam* plaintiff is not properly handling the prosecution. 31 U.S.C.A. § 3730(c)(3) (West Supp.1988). If this occurs and the court grants the application, the government then assumes full control of the prosecution. *Id.* § 3730(c)(1) (West Supp.1988). This renders the need for judicial approval of any limitation of the rela-

---

9. The relator's authority to sue in the name of the government distinguishes the False Claims Act from most private attorneys general statutes where citizen plaintiffs must commence suits on their own behalf. *See infra* note 13.

10. For a more extensive discussion of the procedure that a relator must follow when filing suit, see section I of this memorandum.

11. *See supra* section I of this memorandum.

tor's role somewhat inconsequential.[12]

The most significant issue is the government's need to show "good cause" to intervene at a later stage of the prosecution. This differs from most "citizens' suit"[13] provisions in which governmental intervention is of right.[14] Defendant claims that the necessity of court approval limits executive discretion and threatens the integrity of the judicial process by allowing an inexperienced or incompetent plaintiff to represent the government's interests. It is unnecessary, however, to address as a constitutional matter the merit of these fears for *Morrison v. Olson* makes clear that the good cause requirement does not present a separation of powers problem.

In *Morrison,* the Court approved a more intrusive statutory provision which requires the Attorney General to show good cause for the removal of an independent counsel; once removed, however, the judicial branch has the authority to appoint a replacement and the executive branch is at no time authorized to take part in the litigation in any way. In the instant case, by contrast, upon a showing of good cause the government may enter and subsequently orchestrate the prosecution. If, in short, the good cause provisions of the Ethics in Government Act do not encroach impermissibly on executive authority, it is difficult to see how analogous—and more attenuated—provisions in the False Claims Act could be so construed.

### 3. Phase Three: Terminating the Litigation

If the government joins the suit, it may settle or dismiss it *notwithstanding* the objections of the relator.[15] 31 U.S.C.A. § 3730(c)(2)(A)–(B) (West Supp.1988). If

the government elects not to participate, it may nonetheless intervene to frustrate a settlement it finds unacceptable, provided good cause is shown for the intervention. *See id.* § 3730(c)(3) (West Supp.1988). A relator may, moreover, dismiss an action only with the consent of both the court and the Attorney General. *Id.* § 3730(b)(1) (West Supp.1988).

By the same token, the government also lacks the authority to dismiss an action without the court's consent. This is no cause for concern, however, in light of the wealth of precedent for this sort of requirement. The court must, for example, approve a plea bargain offered by the government in a criminal case to effectuate the settlement. Similarly, the government may file a dismissal of an indictment, information or complaint under F.R.Crim.P. 48(a) only with leave of the court. Other statutory schemes likewise provide for expansive judicial oversight. *See, e.g.,* 15 U.S.C.A. § 16(e) (1982) (court may enter consent judgment proposed by government in antitrust action only if it is in public interest).

In sum, the False Claims Act grants the executive branch greater litigative control than that provided for in the Ethics in Government Act of 1978, which the Supreme Court validated in *Morrison v. Olson.* Accordingly, defendant's constitutional challenge based on the separation of powers doctrine will not lie.

### IV. *The Appointments Clause*

■ Defendant's final argument is that the statute violates the Appointments Clause of the United States Constitution[16]

---

**12.** Given, that is, that the government is responsible for conducting the case, it seems that the court would be quite receptive to claims that the relator, who is no longer a central figure, is hampering its efforts.

**13.** In the interest of enhancing enforcement of federal statutes, Congress has authorized private citizens, acting as "private attorneys general" to sue alleged violators. *See, e.g.,* 15 U.S.C.A. § 2619 (West 1982 & Supp.1988) (Toxic Substances Control Act); 16 U.S.C.A. § 1540(g) (West 1985) (Endangered Species Act Amend-

ments of 1982); 33 U.S.C.A. § 1365 (West 1986 and Supp.1988) (Clean Water Act).

**14.** *See, e.g.,* 15 U.S.C.A. § 2619(c) (West 1982); 16 U.S.C. § 1540(g)(3)(B) (West 1985); 33 U.S.C.A. § 1365(c)(2) (West 1986 & Supp.1988).

**15.** The relator is, however, given the opportunity to voice his objections in a hearing, if he so chooses. 31 U.S.C.A. § 3730(c)(2)(A)–(B) (West Supp.1988).

**16.** The Clause provides, *inter alia,* that the President shall appoint Ambassadors, other public

by allowing government litigation to be conducted by individuals who are not appointed in one of the ways enunciated in the Clause and thus are not "officers" of the United States. *See United States v. Mouat*, 124 U.S. 303, 308, 8 S.Ct. 505, 507, 31 L.Ed. 463 (1888). The principle that only "officers" may conduct litigation on behalf of the government was forwarded in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), where the Supreme Court held that the Federal Election Commission could not engage in civil law enforcement as long as Congress had a role in appointing its members; "[s]uch functions," the Court stated, "may be discharged only by persons who are 'Officers of the United States' within the language of [the Appointments Clause]." *Id.* at 140, 96 S.Ct. at 692.

To begin with, it seems relatively clear that the relators are not "officers" within the meaning of the Clause. They enjoy limited powers, have no formal duties, hold no established office, have no prescribed tenure, and receive no federal emoluments. As such, they are more appropriately classified as "agents" for Appointments Clause purposes. *Auffmordt v. Hedden*, 137 U.S. 310, 327, 11 S.Ct. 103, 108, 34 L.Ed. 674 (1890) (person whose "position is without tenure, duration, continuing emolument, or continuous duties, [and who] acts only ... temporarily" is an agent not an officer under Appointments Clause).

If relators are not officers, the False Claims Act seems at first blush to run headlong into *Buckley v. Valeo*, and thus the Appointments Clause. Upon closer scrutiny, however, it becomes apparent that *Buckley* can be distinguished from the instant case. The former concerned a standing body charged with enforcing federal laws whose members were appointed by Congress, served for a specific tenure, and drew a federal salary. Under these circumstances, the Court was concerned that Congress was encroaching impermissi-

bly on executive branch functions; Congress could not arrogate to itself the power to "enforce [the laws] or appoint the agents charged with the duty of such enforcement." 424 U.S. at 139, 96 S.Ct. at 691–92 (quoting *Springer v. Philippine Islands*, 277 U.S. 189, 202, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928)); *see also Melcher v. Federal Open Market Committee*, 644 F.Supp. 510, 520 (D.D.C.1986) (*Buckley* ... dealt with congressional attempts to delegate executive powers to officers who were, in one fashion or another, beholden to the Congress. The Supreme Court ... struck down what it regarded as congressional attempts to enlarge the legislative authority at the expense of that of the Executive Branch.")

In the instant case, the relator is not appointed by Congress and receives no federal salary. Even more importantly, he is not invested with "primary responsibility" for enforcing the statute in question nor does he have the authority to set policy; he is merely given the right to prosecute a single case, a right which the executive branch may limit in a number of respects. Thus, the underlying rationale of *Buckley v. Valeo* is simply not apposite here.

Lower courts have, moreover, limited the potential reach of *Buckley*, finding the case inapplicable to private parties. *Buckley v. Valeo*, that is, "does not stand for the proposition ... that private persons may not enforce any federal laws simply because they are not Officers of the United States appointed in accordance with Article II of the Constitution." *Chesapeake Bay Foundation, Inc. v. Bethlehem Steel Corp.*, 652 F.Supp. 620, 624 (D.Md.1987); *see also NRDC v. Outboard Marine Corp.*, 692 F.Supp. 801, 816 (N.D.Ill.1988) ("Despite the potentially far-reaching language [of] *Buckley*, the role of private actors was simply not an issue the Court was called upon to address.") In both *Chesapeake* and *Outboard Marine*, the court upheld citizen suit provisions of the Clean Water

---

Ministers and Consuls, Judges of the supreme court, and all other Officers of the United States, whose appointments are not otherwise herein provided for, and which shall be established by Law: but Congress may vest the

Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Department.

U.S. Const. art. II, § 2.

Act against constitutional challenges based on the separation of powers doctrine. 652 F.Supp. at 626; 692 F.Supp. at 817.

In sum, as long as private participation is not a subterfuge for Congressional control, the executive branch's Article II responsibility to execute the laws faithfully is not threatened. Accordingly, defendant's challenge based on the Appointments Clause cannot survive here.

## V. *Conclusion*

The False Claims Act, as most recently amended, is not violative of Articles II and III of the Constitution or of the doctrine of separation of powers. Accordingly, defendant Northrop's motion to dismiss the complaint under F.R.Civ.P. 12(b)(1) is denied.

IT IS SO ORDERED.