**UNITED STATES of America, ex rel. Jackie YELLOWTAIL, Plaintiff/Relator,**

v.

**LITTLE HORN STATE BANK, a Montana Corporation, Defendant.**

**No. CV 91–24–BLG–JDS.**

United States District Court, D. Montana, Billings Division.

April 9, 1992.

 

Dennis G. Chappabitty, Sacramento, CA, Kelly J. Varnes, Billings, MT, for plaintiff/relator.

Randolph Jacobs, Jr., Billings, MT, for defendant.

## MEMORANDUM AND ORDER

SHANSTROM, District Judge.

Presently pending before the court are cross-motions for summary judgment or, in the alternative, a motion to dismiss by the defendant. Upon consideration of the briefs submitted, stipulated facts, and arguments advanced in open court, I am prepared to rule.

## BACKGROUND AND FACTS

On February 1, 1991, plaintiff Jackie Yellowtail filed this action as a putative *qui tam* relator pursuant to 25 U.S.C. § 81. In the complaint, Ms. Yellowtail, an enrolled member of the Crow Tribe of Indians (hereafter "Tribe"), alleges the defendant Little Horn State Bank (hereafter "Bank") entered into a series of lending agreements with the Tribe that required prior approval, in writing, by the Secretary of the Interior and Commissioner of Indian Affairs. Ms. Yellowtail alleges the loans were never approved, and that the Bank acted improperly when, in April 1990, certain funds in tribal accounts were applied by the Bank as a setoff against the indebtedness owed on the various loans in question.

Plaintiff Yellowtail seeks a declaration that the contracts are null and void for lack of written approval as allegedly required in 25 U.S.C. § 81, and further seeks an accounting by the Bank. Moreover, Ms. Yellowtail requests that all monies applied to offset the loans by the Bank be returned, one-half to herself and one-half into the United States Treasury for the use of the Tribe.

For purposes of deciding the instant motions, the parties have stipulated, in the record, to the pertinent facts in this matter. A review of the stipulated facts reveals the following Promissory Notes:

| Note No. | Date | Amount | Purpose |
|---|---|---|---|
| 44919 | 5/27/88 | $30,014.00 | Business |
| 44991 | 6/28/88 | $50,000.00 | Business |
| 45026 | 7/11/88 | $22,000.00 | Business: Payroll |
| 45047 | 7/15/88 | $80,000.00 | Business |
| 45081 | 7/29/88 | $72,500.00 | Business |
| 45177 | 8/31/88 | $35,000.00 | Bus.: Operate Exp. |
| 45188 | 9/2/88 | $46,000.00 | Business |
| 45422 | 12/9/88 | $22,000.00 | Business |
| 45423 | 12/9/88 | $16,000.00 | Business |
| 45588 | 2/1/89 | $ 8,000.00 | Business |
| 46047 | 6/28/89 | $66,000.00 | Business: Payroll |

Promissory Note Nos. 45047, 45081, 45188, 45422, and 45588 were unsecured loans. The Tribe provided security to the Bank on the remaining Notes as follows:

Note No. 44919: Security Agreement dated May 27, 1988, and Uniform Commercial Code Financing Statement filed June 1, 1988, covering a $30,000.00 plus interest portion of tribal administration draw-down from the U.S. Treasury.

Note No. 44991: Security Agreement dated June 28, 1988, covering 1988 second coal tax revenues.

Note No. 45026: Security Agreement dated July 11, 1988, covering coal tax money to be released.

Note No. 45177: Security Agreement dated August 31, 1988, covering wire transfer accounting ∍ C52/202/X/7452/2671/0962.

Note No. 45423: Security Agreement dated December 9, 1988, covering Crow Tribal Land Resource Committee letter of December 6, 1988, to Richard Real Bird and signed by Willie Stewart, Sr.

Note No. 46047: Security Agreement dated June 28, 1988, covering line item dollar request lodged currently with Bureau of Indian Affairs for debt reduction.

---

The Tribe requested and received an extension of maturity dates on all notes; nevertheless, on January 5, 1990, the Notes were due and payable in full for all outstanding balances of principal and interest. The Bank made demand upon the Tribe for payment in full and, on April 20, 1990, exercised its right of setoff, charging Crow Tribe account number 305–102–712–3 the sum of $343,418.16 to repay the past due principal and interest balances on the Notes.

The eleven Promissory Notes in question, which the Tribe was required to repay in money, were taken for the purpose of meeting business and operating expenses for the Tribe. The Security Agreements noted above are in some instances difficult to classify as to their exact nature, however, they involve monies or future revenues as collateral rather than realty.

Ms. Yellowtail moves for summary judgment on the ground that 25 U.S.C. § 81 requires the loans in question be approved in writing and the lack of such written approval entitles her to judgment as a matter of law. The defendant Bank moves for summary judgment as well, alleging various grounds, or, in the alternative, seeks dismissal for lack of standing. I have carefully considered the arguments advanced and agree with the Bank, that Ms. Yellowtail lacks standing to litigate.

## DISCUSSION

### *Qui Tam* Plaintiffs and Standing

█ Plaintiff Yellowtail invokes this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The standing question is, however, a threshold test that must be satisfied in the present case even before considering whether the plaintiff has adequately pled a federal cause of action.[1]

The Declaratory Judgment Act, 28 U.S.C. § 2201, also invoked by plaintiff, is not a jurisdictional grant, but only affords a modern remedy in a "case of actual controversy ... [in the district court's] jurisdiction...." Ms. Yellowtail invokes the Act in search of a remedy, but it may be ignored for purposes of the issue presently before the Court. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *McGrath v. Weinberger,* 541 F.2d 249 (10th Cir.1976), *cert. denied* 430 U.S. 933, 97 S.Ct. 1557, 51 L.Ed.2d 778 (1977).

The critical issue before the Court on the instant motion is whether Ms. Yellowtail has standing to litigate as a *qui tam*[2] relator under 25 U.S.C. § 81, which provides in pertinent part:

No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, ... unless such contract or agreement be executed and approved as follows:

First. Such agreement shall be in writing, and a duplicate of it delivered to each party.

Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it . . .

All contracts or agreements made in violation of this statute shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe, ... may be recovered by suit in the name of the United States in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury for the use of the Indian or tribe by or for whom it was so paid.

25 U.S.C. § 81.

Section 81 contains a *qui tam* provision authorizing private individuals to adopt the government's cause of action and sue on behalf of the United States. These potential *qui tam* plaintiffs, or "relators", receive fifty percent of the recovery.

Although *qui tam* has been around for centuries,[3] its use under the instant statute is virtually non-existent. Its use under the False Claims Act (hereafter "FCA"), 31 U.S.C. § 3729 et seq. (1986), however, has become prominent.[4] It is primarily from the use of *qui tam* under the FCA that plaintiff Yellowtail makes her argument for standing in this case.[5] Due to the sparse treatment of

---

1. Determining whether a party has standing is a "threshold question in every federal case [that] determin[es] the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

2. *"Qui tam"* is short for "qui tam pro domino rege quam pro se imposo sequitur," meaning "who brings the action as well for the king as for himself." *Bass Anglers Sportsman's Soc. v. U.S. Plywood–Champion Papers, Inc.,* 324 F.Supp. 302, 305 (S.D.Tex.1971).

3. The first *qui tam* statutes apparently were passed in fourteenth century England, *see* Note, *The Qui Tam Doctrine,* 7 Tex. Int'l L.F. 415, 418 (1972), and remain a part of British law. 4 William Holdsworth, *A History of English Law* 240 (1938). *Qui Tam* may also be seen in Ameri-

can history in that the First Congress passed at least one *qui tam* statute and the Supreme Court has noted that *qui tam* has been around "ever since the foundation of our government." *Marvin v. Trout,* 199 U.S. 212, 225, 26 S.Ct. 31, 34, 50 L.Ed. 157 (1905).

4. A recent article in the American Bar Association Journal notes that, as of October 26, 1989, 198 *qui tam* suits had been filed under the FCA. *See* France, *The Private War on Pentagon Fraud,* 76 ABA J. 46 (March 1990).

5. Ms. Yellowtail asserts, "The *qui tam* provisions of both laws [FCA and 25 U.S.C. § 81] and their effect in enabling a 'stranger' to litigate as a 'relator' are identical: the authority of Congress to legislate such provisions is analogous in either

this provision by courts under 25 U.S.C. § 81, the FCA provision and cases provide an appropriate analogy.

Ms. Yellowtail vigorously argues that both the constitutionality and standing of *qui tam* plaintiffs, under the FCA, has been litigated and upheld by the courts and that, by analogy to those cases, a § 81 *qui tam* plaintiff has standing to litigate.

The defendant Bank challenges plaintiff's standing in this matter on Article III grounds. While the Bank does not contest the fact that Congress may include a *qui tam* provision in a statute, and has in § 81, it steadfastly argues that any *qui tam* plaintiff must meet the Article III standing requirements. Ms. Yellowtail counters by asserting that, "[I]t is simply not necessary that the relator be injured, so long as the U.S. has an interest to protect" (Brief in Opposition, p. 11), while, at the same time, averring that she has been injured by virtue of her membership in the Tribe "and maintains a concrete and distinct financial interest in the money taken without compliance with Section 81." (Brief in Opposition, pp. 11–12).

### Justiciability and Standing in Federal Court

■ Article III of the United States Constitution defines the role of federal courts in our government of separated powers. Under Section 2 of Article III, the "judicial power" extends to "cases" or "controversies." Courts uniformly hold that unless a plaintiff has "standing" to sue, there is no case or controversy. A plaintiff simply may not invoke the powers of the federal courts unless he can meet three Article III requirements: [6] (1) that he personally suffers some actual or threatened injury, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601,

1607, 60 L.Ed.2d 66 (1979)); (2) that the injury "fairly can be traced" to the defendant's putatively illegal conduct, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976); and (3) that the injury is "likely to be redressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924. While the Supreme Court has admitted that these requirements are "concepts concededly not susceptible to precise definition," *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), *reh. denied* 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984), it has clearly specified that the plaintiff's injury must be "distinct and palpable," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), not "abstract," "conjectural," or "hypothetical." *Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

■ When there is no statute granting an express right of action, courts employ several other "prudential" limitations on standing to sue: (1) the plaintiff's interest must come within the "zone of interests" arguably protected or regulated by the law in question, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); (2) the plaintiff must not allege "generalized grievances" shared in substantially equal measure by all or a large class of citizens, *See United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); and (3) the plaintiff must assert his own legal interests rather than those of third parties. *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206.

■ Ms. Yellowtail contends that Congress specifically granted an express right of action and conferred standing on *qui tam*

---

situation," and "[t]he corollary between the *qui tam* provisions of Section 81 and the FCA are undeniable." Plaintiff's Brief in Opposition to Defendant Little Horn State Bank's Motion for Summary Judgment, p. 13.

**6.** Some courts seem to adhere to two requirements, with the ability to trace the injury to the

challenged action and the likelihood of redress being simply two facets of a single causation requirement. *See* e.g., *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).

plaintiffs to assert that action in § 81. I agree and, therefore, employment of any prudential limitations is unnecessary.[7] This, however, does not settle the question of whether Ms. Yellowtail meets the Article III requirements for standing. Even a statute cannot abrogate the Article III minima. *Gladstone*, 441 U.S. at 100, 99 S.Ct. at 1608. More specifically, a naked statutory grant of standing, absent a "distinct and palpable injury," violates Article III. *See McClure. v. Carter*, 513 F.Supp. 265, 271 (D.Idaho) (three judge court), (1981) *aff'd* without opinion, *McClure v. Reagan*, 454 U.S. 1025, 102 S.Ct. 559, 70 L.Ed.2d 469 (1981).[8] Thus, in order for a plaintiff to satisfy Article III in the context of 25 U.S.C. § 81, he or she must allege a distinct injury fairly traceable to the contracts at issue and likely to be redressed by a decision in plaintiff's favor. It is this injury in fact prong of the Article III analysis that poses a problem for plaintiff in the case at bar.

Plaintiff Yellowtail misunderstands the historical development of standing doctrine when she cites *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), and *Marvin v. Trout*, 199 U.S. 212, 26 S.Ct. 31, 50 L.Ed. 157 (1905), for the proposition that those cases somehow release a modern *qui tam* plaintiff from the requirements of Article III. Ms. Yellowtail states, they "*implicitly* ratified a *qui tam* plaintiff's standing by stating that an informer had a right to sue for recovery *even though they had 'no interest whatsoever in the controversy other than that given by statute.'*" (Brief in Opposition, p. 14). While the cases cited do support the ability of *qui tam* plaintiffs to sue pursuant to statutory grant alone, they have virtually nothing to do with the Article

III requirements noted above. Modern standing, including the injury in fact requirement, is a developing twentieth century attempt to interpret the "case" or "controversy" requirement of Article III. Historically, Article III justiciability depended only on the availability of the proper writ or form of action. As the Court explained in *Osborn v. President, Directors & Co. of Bank*, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), justiciability existed only where a legal question "assume[d] such a form that the judicial power [was] capable of acting on it." *Id.*, 22 U.S. at 819. Until the modern doctrine of standing took full shape, the form and not the substance of a proceeding determined its Article III justiciability. *Tutun v. United States*, 270 U.S. 568, 577, 46 S.Ct. 425, 426, 70 L.Ed. 738 (1926);[9] *See also Muskrat v. United States*, 219 U.S. 346, 356–59, 31 S.Ct. 250, 253–54, 55 L.Ed. 246 (1911); and *Keller v. Potomac Electric Power Co.*, 261 U.S. 428, 444, 43 S.Ct. 445, 449, 67 L.Ed. 731 (1923).

The Supreme Court in modern times has insisted that the standing requirements coincide with forms "historically viewed as capable of judicial resolution," *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), and the present Article III requirements do just that. Those requirements represent, however, a significant development in the area of standing over *Marcus* and *Marvin*, cited by plaintiff, while in no way contradicting the holdings in those cases.

Ms. Yellowtail relies heavily on *United States ex rel. Newsham v. Lockheed Missiles & Space Co*, 722 F.Supp. 607 (N.D.Cal.1989) and *United States ex rel. Truong v. Northrop Corp*, 728 F.Supp. 615 (C.D.Cal.1989), finding *qui tam* standing in FCA actions.[10] The

---

**7.** Arguably, a "zone of interest" analysis is still required under *Association of Data Processing Service Organizations, Inc.* when a statutory grant of standing exists. Nevertheless, such an analysis is only necessary, if at all, as a *limitation* on standing once Article III requirements are met.

**8.** In *McClure*, despite a congressionally created cause of action, the Court held that a senator did not have standing to challenge the appointment of a federal judge because he could allege no distinct injury. *Id.* at 271.

**9.** The Court in *Tutun* noted: "Whenever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Constitution." *Id.* 270 U.S. at 577, 46 S.Ct. at 427.

**10.** Plaintiff also refers to a district. court memorandum directly addressing the standing issue under 25 U.S.C. § 81, *U.S. ex rel. Buxbom v. Naegele Outdoor Advertising Co.*, No. CV 81–6269 RG (C.D.Cal.1983). The court in *Buxbom* nodded in the direction of the Article III injury in fact requirement and even alluded to the assign-

court in *Newsham* made brief reference to *Valley Forge's* personal injury requirement, but deemed *Valley Forge* "easily distinguished" simply because "it was a taxpayer's case." *Newsham*, 722 F.Supp. at 614. After dismissing the injury in fact requirement, the court relied on vague notions of "personal stake," taking substantial comfort in *qui tam's* history. *Id* at 613–15. Whether the plaintiff in *Newsham* actually had standing is of no concern in the instant case. The court alluded to Article III's minima requirements and then, essentially, without analysis, asserted that Congress has the power to ignore it.[11]

 The court in *Truong*, on the other hand, carefully analyzed the Article III requirements and came to the conclusion, as I have, that such minima requirements cannot be abrogated by statute. *See Truong*, 728 F.Supp. at 617. Moreover, the court in *Truong* correctly declined to find too much in the *qui tam* historical argument. *Id.* at 617–18. Instead, the court concluded that the *qui tam* relator had standing based on the injury to the government. *Id.* at 618–19. In such circumstances, the court further concluded that "it is superfluous to require that the relator be individually aggrieved." *Id.* at 619. The *Truong* decision highlights the difficulty for a *qui tam* plaintiff meeting the Article III requirements. A *qui tam* plaintiff, and in this case, Ms. Yellowtail, cannot assert standing by alleging his or her own injury in fact or by simply claiming that a statute creates an individualized injury for him or her. On the other hand, however, for the *qui tam* provisions in statutes to have any validity, there must be some way a *qui tam* plaintiff can meet the Article III requirements. Underlying the *Truong* court decision is the assumption that the *qui tam* plaintiff is an assignee of the government's

interest in the specific litigation. In *United States ex rel. Stillwell v. Hughes Helicopters, Inc*, 714 F.Supp. 1084 (C.D.Cal.1989), the court provided analysis on this issue. The plaintiff in that case, a private citizen and employee of Hughes Helicopters, brought a *qui tam* suit under the FCA alleging that Hughes overcharged the government on a defense contract. The court in *Stillwell* acknowledged the injury in fact requirement, but concluded there was no constitutional prohibition to the relator's suing under the statutory grant of standing, on the government's injury. In other words, the "False Claims Act essentially creates, by legislative fiat, a de facto assignment of a portion of the government's interest in the action." *Id.* at 1098. Although the court in *Stillwell* posited other ways that a *qui tam* plaintiff might have a constitutionally sufficient stake, I find only the assignment theory persuasive. An assignee has standing because he stands in the shoes of the assignor, whose asserted distinct injury assures that the court will not involve itself in matters properly resolved by other branches of government. The underlying injury to the assignor assures an Article III case or controversy. In such circumstances, as the court in *Stillwell* concluded, "it is superfluous to require that the relator be individually aggrieved." *Id.* at 619. The Seventh Circuit Court of Appeals recently recognized this principle, "[I]f an injured person assigns his right of action to someone else, the assignee has standing to enforce the right even though he is not the one who was injured by the defendant's wrongdoing." *National Asso. of Realtors v. National Real Estate Asso*, 894 F.2d 937, 941 (7th Cir.1990).

Turning to the case at bar, I find that, although it is possible for a *qui tam* plaintiff under 25 U.S.C. § 81 to meet the Article III

or-assignee relationship; however, without analysis the court stated: "The harm which confers standing to bring suit under Section 81 is a generalized harm to the expressed policy of Congress." This statement so completely brushes aside the concreteness requirement of Article III that it offers no help with applying § 81 to the facts of this case.

**11.** "[W]here Congress has authorized judicial review of an issue, the standing inquiry begins with a determination of whether the statute in ques-

tion authorizes review at the behest of the plaintiff. As long as an issue is justiciable, e.g. not a political question, Congress has the power to determine who is a proper party to a lawsuit." *Newsham*, 722 F.Supp. at 614. Besides oversimplifying the issue of "Justiciability," the court's conclusion in *Newsham* does not square with the Supreme Court's holding in *Gladstone*, 441 U.S. at 100, 99 S.Ct. at 1608, that not even a statute can abrogate the Article III minima.

minima, Ms. Yellowtail does not do so. In order to preserve the Article III core, assignment must be allowed only where the government's suit would satisfy the distinctive injury in fact requirement of Article III.[12] Article III therefore permits *qui tam* only when the government's suit vindicates a "distinct and palpable" injury. In the present case, I find that the government's suit against the Bank under 25 U.S.C. § 81 does not vindicate a "distinct and palpable" injury as contemplated under that statute. For the government to attach a *qui tam* provision to a statute, allowing suit in its name, presupposes a governmental interest. The only interest the government has in overseeing certain contracts and agreements with Indians flows from its duties as trustee of tribal resources. The trust resources alluded to in § 81 are those "relative" to Indian lands. A plain reading of the statute reveals that the contracts or agreements subject to written approval under § 81 are those "in consideration of services for said Indians." The contracts underlying the present lawsuit were loan agreements providing operating expenses to the Tribe in times of need. The agreements were for loans which the tribe was required to repay in money and the Bank acquired no control over tribal lands. The loans were not "in consideration of ser-

vices." The loans were not "relative" to Indian lands.

Plaintiff's assertion of an injury to the government based on its general trust relationship with the Tribe is abstract and conjectural.[13] It does not meet the concreteness required by Article III. Ms. Yellowtail attempts to get around this problem by contending that the accounts from which the Bank set off the Tribe's debts contained monies derived from sources "relative" to tribal land. (Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure, p. 3). This is a bare conclusory statement, if not entirely speculative. Even if such a statement is relevant, it is unsupported in the record before the Court.

I find the lending agreements themselves, rather than any security agreements,[14] constitute contracts to loan money and, as such are not "relative" to Indian lands. I further find that the government simply has not suffered any "distinct and palpable" injury. The nature of the government's interest is in the Tribe's trust resources "relative to the land." That interest is not affected in this case.[15] If the government were a private

12. To do otherwise would be to leave Congress holding all the keys to standing and no Article III core left. All Congress would have to do to create standing for individuals is to create a right of action for the government and then "assign" it by tacking on a *qui tam* provision.

13. Ms. Yellowtail also argues she has been personally injured by virtue of her membership in the Tribe. *This contention is abstract as well.* Further, it is the government's interest which provides standing under § 81. Moreover, such an assertion displays the amazing nature of the present lawsuit. Ms. Yellowtail seems to infer that the Tribe was somehow injured under the stipulated facts, which reveal nothing more than the Tribe, at its own initiation, sought and received loans for normal business and operating expenses.

14. While the nature of the Security Agreements may be difficult to satisfactorily classify, it is unnecessary to do so in this case. The Bank exercised its right of setoff rather than seeking repayment pursuant to the Security Agreements. Further, the loans themselves, which are in no way "relative" to Indian lands, are not subject to § 81, even if the Security Agreements were found

to be violative of the statute. Although the issue is not determinative of the present motions, it may be possible for the government to properly allege an injury in fact when unapproved contracts or agreements clearly jeopardize "tribal funds" or "trust funds." Although that has been alleged in this case, it is without foundation. As terms of art, "tribal funds" and/or "trust funds" typically refer to a well understood category of funds held in the Treasury of the United States or invested by the Bureau of Indian Affairs to the credit of the tribe pursuant to law or treaty. *See* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, Ch. 9, Sec. D2c, p. 561 (1982 ed.) for a discussion of the historic difference between real and personal tribal property.

15. If this "interest" analysis is applied in *qui tam* actions brought under the FCA, its application, as well as its contrast to the instant case, is easily seen. The nature of the interest at stake under the FCA is protection of fraud against the government. Anytime fraud is perpetrated against the government, the government is presumptively injured. If a private citizen has knowledge of fraud against the government, he or she may bring a *qui tam* action in the name of the government. On the other hand, anytime Indians enter

plaintiff, it would not have standing to sue since it has suffered no injury contemplated under 25 U.S.C. § 81. Thus, Ms. Yellowtail, as a *qui tam* plaintiff under § 81 (proceeding as the government's assignee) does not have standing to sue in this matter.

Plaintiff Yellowtail has made numerous references in this case to 1990 criminal litigation involving various Crow Tribe officials as somehow supporting the claims in the present action. I find all such references irrelevant to the matters presently before this Court.

Since Ms. Yellowtail is unable to meet the threshold requirement of standing in this case, dismissal for lack of subject matter jurisdiction, rather than summary judgment, is appropriate.

Based on the foregoing,

**IT IS ORDERED** that plaintiff's motion for summary judgment is hereby denied.

**IT IS FURTHER ORDERED** defendant's motion to dismiss is hereby granted.[16]

The Clerk of Court is directed to forthwith notify the respective parties of the making of this order.

**DONE and DATED.**

into agreements with non-Indians does not necessarily result in an injury to the government. An injury in fact occurs only when the government's interest in trust resources is jeopardized. Under 25 U.S.C. § 81, the trust resources must be "relative" to Indian lands.

16. Technically, dismissal of this action is without prejudice and theoretically the standing defect could be cured and this action re-filed. I find, however, the specific defect in this case is incurable under the present stipulated facts. The nature of the contracts or agreements in this matter and the lack of any government interest therein, compel me to conclude that the government cannot reasonably allege any injury in fact based on the Bank's putatively illegal conduct.