**OREGON NATURAL RESOURCES COUNCIL, INC., Breitenbush Community, Inc., Michael Donnelly, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, James Torrence, Regional National Forester, and Bugaboo Timber Company, Defendants.**

Civ. No. 86–6504–BU.

United States District Court, D. Oregon.

May 7, 1987.

Ralph Bradley, Bradley and Gordon, P.C., Eugene, Or., for plaintiffs.

Thomas C. Lee, Asst. U.S. Atty., Robert M. Simmons, Sp. Asst. U.S. Atty., John F. Neupert, Miller, Nash, Wiener, Hager and Carlsen, Portland, Or., for defendants.

JAMES M. BURNS, District Judge.

## INTRODUCTION

This is another environmental case. But that phrase is, perhaps, more deceptive than descriptive. Each environmental case is both the same and different. The issues are generally the same, or similar; the scenery, never. The valleys, the peaks, the colors, the trees, the skies, the streams, and the views—all are subtly, or strikingly different.

The centerpiece of the area involved in this case is a river gorge of heart-stopping magnificence. It lies at the bottom of a steep slope of old growth virgin timber; brooding, and presiding over this area is majestic Mt. Jefferson, whose name has been given to the nearby wilderness area. Its beauty is as deep as the determination of the plaintiffs, who seek to protect it by asking me to stop the logging that is about to begin. The strength and solidarity that surround it is matched by the determination of the Forest Service—and its contractor—who believe, with equal fervor, that they are fulfilling economic and governmental policies which possess or express equal, or greater societal value. I have no escape from having to decide.

Plaintiffs, Oregon Natural Resources Council, Inc., (ONRC) Breitenbush Community, Inc. and Michael Donnelly, bring this action challenging a decision by the United States Forest Service and its Regional Forester (USFS) to approve, offer and sell the North Roaring Devil contract in the Willamette National Forest to Bugaboo Timber Co. (Bugaboo). The sale, which has three segments, or "cutting units", will "clear cut" a total of about 61 acres.

## PROCEDURAL HISTORY

Plaintiffs originally made three claims for relief.[1] First, plaintiffs assert that

---

1. Plaintiffs later moved to amend the complaint by adding a "spotted owl" claim and a claim

they have been denied their right to administrative appeal. Second, that USFS has violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. Third, that USFS has violated the Clean Water Act, 33 U.S.C. § 1323 and Oregon's Water Quality Standard for nondegradation, Oregon Administrative Rule 340–41–026(1)(a).

At the outset, plaintiffs asked for a temporary restraining order and a preliminary injunction when Bugaboo was ready to embark on the first phase—construction of a temporary bridge across the South Fork of the Breitenbush River. This phase also included cutting trees in the right of way of the logging road which will allow removal of logs cut in the challenged sale. On November 5, 1986, I denied the request for injunctive relief. The logging schedule at that time envisioned that the main aspects of contract performance—construction of the permanent bridge, bringing of the road up to USFS standard, and actual cutting and removal of the trees from the three units would not begin until spring of 1987. It was anticipated that, given the discovery necessary, and other case processing; hearing the case on its merits could be accomplished free of the pressures which normally accompany these cases at the preliminary injunction stage.

BACKGROUND

In 1977, USFS adopted the Final Environmental Statement on the Multiple Use Land Management and Timber Management Plans for the Willamette National Forest (FES). The FES divided the forest into five planning units, one of which, the North Santiam Planning Unit, contains the North Roaring Devil timber sale. The FES allocated the forest area containing this sale to general forest use, which permits management of the area for sustained yield timber production.

On September 29, 1980, USFS completed an Environmental Assessment (EA) for the North Roaring Devil timber sale and made a Finding of No Significant Impact (FONSI). That decision was not challenged ad-

ministratively. The purchase was made September 29, 1981. However, no timber was harvested. Rather, the sale was later returned by the buyer to the Forest Service under provisions of the Federal Timber Contract Payment Modification Act of 1984 (FTCPMA), 16 U.S.C. § 618 et seq.

In 1985, USFS reviewed the sale pursuant to the provisions of FTCPMA, to take any new environmental standards into account. On December 4, 1985, USFS modified the sale by reducing the amount of road to be constructed, deleting 6.7 million board feet of timber, and reducing the impacts to the spotted owl management area (which was established after September 29, 1981). On January 20, 1986, plaintiffs sought to appeal that modification. (Exhibit 113). On February 5, 1986, USFS dismissed the appeal because it was not filed within 45 days of the decision. (Exhibit 117). According to USFS, the decision to sell the timber was made on September 29, 1980 and an appeal, to be timely, must have been filed within 45 days of the decision. 36 C.F.R. § 211.18(c).

On August 1, 1986, USFS advertised this sale, as modified by the December 4, 1985 action and, on October 1, 1986, awarded the resale to Bugaboo. On October 20, 1986, plaintiffs sought to appeal the award of the resale. (Exhibit 118). USFS dismissed the appeal as untimely. (Exhibit 119). No further administrative challenge to either the modification of December 4, 1985 or the October 1, 1986 resale was made by plaintiffs. Plaintiffs brought this action on October 31, 1986, requesting declaratory and injunctive relief.

Plaintiffs and Bugaboo move for summary judgment. The USFS moves to dismiss plaintiffs' complaint and, alternatively, for summary judgment. These motions were supported by exhibits and affidavits as allowed by Fed.R.Civ.P. 56. A hearing was scheduled, in accordance with a practice I have generally followed in environmental cases; at such hearings, my practice has been to request preparation of narrative

---

under the Endangered Species Act of 1973 16 U.S.C. 1536(c)(1); at our concluding hearing on March 26, I granted this motion, but ruled that

issues posed by these two new claims would be segregated for disposition under Fed.R.Civ.P. 41.

witness statements, and to afford supplementary direct examination by the offering party and cross-examination by the opponent. On February 6 and 7, 1987, such a hearing took place.

VIEW

At a recess during the hearing in February, I suggested to counsel that I was considering a view of the area involved, and asked them to respond to this suggestion. Plaintiffs endorsed, and defendants opposed the view. Thereafter, I called a conference to discuss the date for, and rules regarding the proposed view. Present at the conference were counsel, plus members of the news media (plus one lawyer who represented a TV station) who had expressed a keen desire to attend the view.

■ Defendants continued to oppose the view; further, if a view were to be taken, defendant Bugaboo opposed the presence of cameras by TV personnel, and still pictures by newspaper personnel, relying on Local Rule 130–1.[2] Bugaboo also contended that any colloquy that occurred during the view must be reported.

In essence, I ruled as follows. News gatherers would be allowed to accompany the court and counsel during the view itself; second, the news people were not allowed to conduct interviews of court, counsel or parties during the view. An opportunity was provided before and after the view for news persons to put questions to counsel and parties (or representatives) if they cared to respond to such. My expectation was that the view would be just that—a view, and not a testimony taking session. I wanted to have representatives of the Forest Service point out to me, at my request, geographic and physical features so that I could orient myself in light of the maps and other items of evidence received in the earlier court sessions. I did not wish to be distracted; nor did I wish counsel to be distracted.

The view, which occurred on March 5, 1987, lasted about two hours. The foregoing rules were observed by all concerned in an easy and accommodating manner. When the view was concluded, the court, counsel and representatives of the parties met at the ranger station. On the record I summarized the view and gave each of the attorneys the opportunity to correct the court's summary and supplement the record as they wished. Included in the court's summary was detail regarding the areas and features observed, including certain statements during the view made by District Ranger David Alexander. These, arguably, could have been descriptive testimony rather than merely geographic identification. At that conference, representatives of the media were present but were not allowed to record or film the proceeding.

I record here my compliments especially to the news gatherers for their cooperation and their easy and comfortable compliance with the rules. Counsel and I were undistracted from our responsibilities. In addition, so far as I am aware, news gatherers

---

2. I do not believe L.R. 130 applies to the view in that the site was not "courtroom or courtroom area." In addition, Local Rule 130–1 must be read in light of another provision of our Local Rules which provides as follows:

The court may from time to time amend these Local Rules, and a judge, on his or her own motion or on motion of any party, may change or dispense with any Local Rule for a particular case. L.R. 100–3.

It is unnecessary for me to determine whether the Judicial Conference has any constitutional or statutory *power* to prevent an Article III District Judge from allowing video taping or still picture taking of a court session or proceeding. Presence of camera operators did not in any way distract from the value I derived from the view; nor did I gain any impression that counsel in any way felt hampered in their participation in the view.

In making my ruling I considered Resolution G adopted in March 1979 by the Judicial Conference pursuant to 28 U.S.C. § 331. The resolution is as follows:

RESOLVED, That the Judicial Conference of the United States condemns the taking of photographs in the courtroom or its environs in connection with any judicial proceedings, and the broadcasting of judicial proceedings by radio, television, or other means, and considers such practices to be inconsistent with fair judicial procedure and that they ought not to be permitted in any federal court. A judge may, however, permit the broadcasting, televising, recording, or photographing of investiture, ceremonial or naturalization proceedings.

seemed to have been fully able to carry out their responsibilities.[3]

As regards the request by Bugaboo that the view be reported, I denied it, given the physical and geographical circumstances. The (pioneer) logging road along which the view proceeded was muddy and partially covered with snow. Those conditions together with the lack of level ground made it difficult, if not impossible, for a court reporter to do his job. The first stop on the view was at the site of the temporary bridge. There I asked the first question of the District Ranger regarding the physical location of the bridge and its relationship to the area to be logged. After the ranger furnished his answer, each of the attorneys, including Bugaboo's, was asked if they wished the colloquy reported. All replied negatively. Additional colloquies, with the consent of all, were not reported.

In its written objection to the view, Bugaboo cited *Snyder v. Massachusetts*, 291 U.S. 97, 121, 54 S.Ct. 330, 338, 70 L.Ed. 674 (1934) and *United States v. Walls*, 443 F.2d 1220, 1223 (6th Cir.1971) in support of its position that the view was improper. In overruling these objections, I noted there were no confrontation questions as in *Snyder* and counsel and representatives of the parties were allowed to be present during the view, in contrast to *Walls*. This authority cited by Bugaboo furnishes only the most minimal support for the proposition that a trial judge, even in a case under NEPA, should be prevented from a view of the premises.

■ It is frequently said that even without express statutory authorization there is an inherent power in the trial judge to take a view himself. McCormick, *McCormick on Evidence* § 216 (3rd ed. 1984). A trial judge is in most instances vested with a wide leeway of discretion to grant or re-fuse a view. *Hametner v. Villena*, 361 F.2d 445 (9th Cir.1966).

I now take up plaintiffs' original three claims for relief.

*Administrative Appeal*

36 C.F.R. § 211.18(a)(1) provides: the "[d]ecisions of Forest Officers concerning the National Forest System * * * are subject to appeal." Plaintiffs contend USFS violated this regulation by its dismissal of the reoffer appeals as untimely. According to plaintiffs, a reoffer constitutes an appealable decision within the meaning of 36 C.F.R. § 211.18(a)(1). USFS contends the reoffer is an action implementing the earlier decision to sell the timber and, as such, is not controlled by the regulation.

16 U.S.C. § 618(a)(5)(A) provides:

Timber returned or defaulted contracts shall be offered for resale in an orderly fashion.... Timber from returned or defaulted contracts shall be given preference in the Forest Service timber sales program.

The legislative history of this provision states:

[S]ubparagraph (5)(A) provides that timber from

returned or defaulted contracts be given preference for resale in the agency timber sale programs. The intent of this provision is that where other factors are similar, the agencies should offer returned or defaulted timber first before offering new sales. From an economic point of view, these sales should be offered first because of cost savings to the government. They have already received extensive study of such matters as boundaries, rights of way and environmental factors; timber volume and sale designs have already been surveyed, and personnel have already administered the sale. Reoffered sales, however, should

---

**3.** In connection with the procedure fashioned here involving the view—and the presence of the media during the view—I must record here my debt to two of my colleagues on the faculty of the National Judicial College in Reno, Nevada, Judge Nat H. Hentel of the Queens County Civil Court (N.Y.), and Judge (Ret.) Tim Murphy of the District of Columbia Superior Court. These judges have taught the NJC course which covers matters as to the relationship between the courts and the media. For a discussion on the relationship between judges and reporters for newspapers, television and radio, see, Donald R. Fretz, *Relations With News Media,* in Courts and the Community 9 (National Judicial College 1973). This publication proved helpful to me in arriving at the solution devised in this case.

be reviewed and updated in order that any newer environmental standards can be taken into account.

S.Rep. 98-596, 98th Cong., 2nd Sess., *reprinted in* 1984 U.S.Code Cong. and Admin.News pp. 3796, 3814, 3815.

■ In providing for priority reoffer of timber from returned contracts, Congress did not contemplate full review of the earlier decision to sell the timber. Thus, the reoffer of the North Roaring Devil sale does not constitute a "decision" within the meaning of 36 C.F.R. § 211.18(a)(1) and USFS did not violate its regulation when it dismissed the reoffer appeal as untimely. *Citizens Task Force on Timber Sale Review v. United States Forest Service,* No. 86-1200, slip op. (D.Or. October 23, 1986) (Leavy, J.) [Available on WESTLAW, DCT database], *appeal docketed,* No. 87-3505 (9th Cir. January 9, 1987). Additional comments on this are contained in my Opinion and Order denying the plaintiffs' motion for a Temporary Restraining Order issued on November 5, 1986.

Section 320 of the Interior and Related Agencies Appropriation Act, P.L. 99-591, which was signed into law on October 30, 1986, provides that:

to assure that National Forest and Bureau of Land management timber included in sales defaulted by the purchaser, or returned under the Federal Timber Contract Payment Modification Act (Public Law 98-478), is available for resale in a timely manner *such sales shall be subject only to one level of administrative appeal.* This limitation shall not abridge the right of judicial review. Actions on such administrative appeals should be completed within 90 days of receipt of the notice of appeal. Sales that are reoffered shall be modified, including minor additions or deletions, as appropriate, to reduce adverse environmental impacts, pursuant to current land management plans environmental impacts, pursuant to current land management plans and guidelines, and such modifications in themselves should not be construed to require the preparations of new or supplemental environmental assessments. (Emphasis added) Interior and Related Agencies FY 87, Pub.L. 99-591.

■ Plaintiffs construe this language so that it subjects reoffered sales to at least one level of administrative appeal. The USFS believes this language does not mandate a level of review, but acts as a limit on any right to administrative appeal that does exist. The Committee report provides:

The managers have agreed to include modified Senate language which limits administrative appeals to one level of appeal on all returned or defaulted timber sales within the Forest Service and Bureau of Land Management. The modified language retains opportunities for judicial review. The agencies should complete action on such appeals within 90 days, whenever possible, but may, at their discretion extend the deadline for completion of such action. The managers make no attempt to prejudge the nature, cause, basis or standing of an administrative appeal brought before the agencies on returned or defaulted timber sales; however, because of the heavy reliance on such sales in this year's timber sales program, and because of the importance of a timely and stable sales program administrative appeal shall be limited to one level of appeal within the respective agencies. (H.R. Report No. 99-1002, page 77).

I do not believe Congress intended to mandate a review of the scope and breadth for which plaintiffs have contended. In reaching this conclusion I have considered the interest expressed by Congress that environmental concerns not unduly impede the general level of timber harvest in view of societal values warranting a steady flow of timber so as to avoid economic distress in Western Oregon; the importance Congress attached to a timely and stable sales program; and recognition by Congress that resales have already received extensive study of environmental factors.

Furthermore, even if Congress intended to mandate one level of administrative appeal, there is no indication Congress intended the language to apply retroactively to timber sales that had been awarded prior to enactment of the law. It is important to note that the modification made by the

USFS on December 4, 1985 reduced the road construction, reduced the amount of timber to be cut, and reduced the impacts to the spotted owl management area without adding any new land to the sale. It would seem to be inappropriate to require USFS to entertain fullscale appeal by plaintiffs when the modifications all seem to have been beneficial from plaintiffs' viewpoint. Logic would seem to indicate that the result of an administrative challenge to the adequacy of this modification decision would be to increase the road construction, increase the amount of timber to be cut or increase the impacts to the spotted owl management area. Clearly, plaintiffs do not seek any of these results.

For these reasons I reject plaintiffs' claim that they have been denied their right to administrative appeal.

## NEPA VIOLATIONS

■ Plaintiffs contend USFS failed adequately to analyze the cummulative impacts of scheduled timber sales in the Breitenbush drainage, particularly in the context of access to a roadless area by a single bridge and road.

A district court's review of an environmental impact statement (EIS) "covers only the issue of whether NEPA's procedural requirements have been met, and whether the EIS performs its primary function of presenting the decision-maker with an environmentally-informed choice." *Stop H–3 Ass'n. v. Dole,* 740 F.2d 1442, 1461 (9th Cir.1984).

In reviewing the FES, I employ a twofold standard. First, NEPA's procedural requirements must be observed. In addition, an environmental impact statement should accomplish its purpose, which is both to provide decision makers with enough information to aid in the substantive decision whether to proceed with the project in light of its environmental consequence and to provide the public with information and an opportunity to participate in gathering information. *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1056 (9th Cir.1985).

I am satisfied that the agency has taken this procedural and substantive "hardlook" at the environmental consequences in the FES, the EA, the FONSI, and the review pursuant to the FTCPMA.

While the USFS obviously did not look at all the matters plaintiffs believe should have been considered, there is no NEPA violation where as here, a "hard look" is taken. Having concluded that the appropriate "hard look" has been taken, I may end my inquiry.[4] However, I am prepared to make findings with respect to the thoroughness of the discussions of the significant aspects of the probable environmental consequences.

The FES (Exhibit 125) devotes 60 pages to discussing the impact on the North Santiam planning unit of the various planned activities, including timber harvesting. The USFS evaluated planned activities effects on the North Santiam planning unit resources, including:

1. soil disturbance and erosion (pp. 41–43)
2. mass soil-geologic movement (pp. 43–45)
3. air quality (p. 45)
4. fire and fuels management (pp. 45–46)
5. vegetation including endangered and threatened species (pp. 46–47)
6. wildlife—including endangered, threatened and unique species (pp. 47–49)
7. fisheries (pp. 49–51)
8. water quality (pp. 51–52)
9. timber supply (pp. 52–55)
10. minerals (pp. 55–56)
11. geothermal (p. 56)
12. recreation supply and experience levels (pp. 56–58)
13. roadless areas (pp. 58–59)
14. open space (p. 59)
15. visual quality (pp. 59–60)
16. wild and scenic rivers (pp. 60–61)
17. transportation—roads (pp. 61–62)

**4.** During final argument on March 27, 1987, plaintiffs' counsel agreed that if I were to reject plaintiffs' NEPA claim, then I need not rule on their claimed denial of administrative appeal rights and vice-versa.

18. transportation—trails (p. 62)

19. patterns and contrasts between private and national forests and adjacent Forest Service lands (pp. 68–69)

20. cultural resources—historical, archeological and natural landmarks (p. 69)

21. educational and scientific opportunities (p. 70)

In addition, the FES discussed short-term and long-term effects of planned activities on those resources (pp. 72–76).

Plaintiffs' claims have been aimed primarily at what they say is the failure of USFS to adequately consider the cumulative effect of timber harvesting on water quality and wildlife habitat. The FES acknowledged that timber harvesting will have an adverse effect on water quality:

"These effects should be manifested in increases in sediments and water temperature and decreases in dissolved oxygen, food and spawning gravel." (Ex. 125, p. 50)

"General Forest land use allocation areas have the greatest potential risk to the water resource. As was discussed under *Fisheries* previously, logging activities (and roading) increase stream temperature, turbidity and nutrient levels. Dissolved oxygen levels occasionally are decreased. * * *

"The upstream timber management practices can initiate undesirable downstram water quality effects. * * * "

"Implementation of the proposed Multiple Use Land Management Plan Management Plan will continue to have some adverse effect on rivers, creeks and Detroit Lake in the Northern Santiam Planning Unit. As accessibility is extended into other areas now unmanaged and the transportation system is completed, all major drainages will have soil disturbance of one degree or another. Some increases in annual sediment yields and water temperatures can be expected. This will be short-term and may cause short-term declines in the numbers of resident rainbow trout, cutthroat trout, and anadromous fish species. * * *

"Over the long-term, the effects of increased road construction and timber harvesting will level off and begin to drop as water quality and fisheries gradually regain their losses of the first two time periods [first decade and the succeeding 35 years]. However, some streams may take considerably longer to regain their full potential. * * * " (Ex. 125, p. 73).

In addition, the FES recognized that the harvesting of old growth timber will affect wildlife habitat:

"Spotted owl habitat is reduced as undisturbed old growth stands 200 plus acres in size diminish. * * *

"About 32 percent of all bird and animal populations will decline at least to some degree as a result of timber harvest activities in the General Forest Allocation * * *.

"Cavity nester habitat will be reduced, as intensive forest management and safety requirements reduce the number and quality of standing snags, and as fuels management efforts decrease forest floor habitat. Habitat quality also decreases as man's management activities infringe around meadows, natural openings and water. This, coupled with cuttings that increase sight distance, increases game harassment and winter stress. * * * "

(Ex. 125, pp. 48–49)

"As old growth stands are converted to managed stands, wildlife species populations dependent upon old growth habitat are expected to decline. * * * "

"There will be some reduction in wildlife species populations. These will be principally those species dependent on old growth timber habitat or species which are less adaptable to the continued presence of humans. There will be reductions in the amount of old growth timber as over-mature stands are converted to managed stands. Loss of old growth habitat is, for practical purposes, irretrievable. * * * " (Ex. 125, p. 77)

Additional evidence of the evaluation given to the probable cumulative environmental consequences are contained in Exhibits 133A and 134A, statements by USFS employees John Fertig and Raoul Gagne.

For these reasons I reject plaintiffs' claim that the USFS has not adequately reviewed the cumulative environmental effects of the proposed timber sale. Plaintiffs' claims go far beyond the requirements imposed by NEPA and its regulations, at least as I read them in light of governing NEPA case law.

*Clean Water Act Claim*

Plaintiffs allege a violation of section 313 of the Clean Water Act (Act), 33 U.S.C. § 1323. In the interest of keeping this opinion to a reasonable length, I shall briefly state my reasons for rejecting this claim.

▇ Section 505(b) of the Act, 33 U.S.C. 1365(b), contains a 60–day notice provision as a jurisdictional prerequisite to filing a citizen's suit to enforce alleged violations of the Act. Plaintiffs cite *Susquehanna Valley Alliance v. Three Mile Island*, 619 F.2d 231 (3rd Cir.1980), in support of their argument that the 60–day notice provision is not a jurisdictional prerequisite. This unique case is unpersuasive in the face of contrary authority cited by defendants. The required 60–day notice is neither pled nor proven; this claim is therefore premature.

▇ Further, if I were to consider the Clean Water Act claim on the merits, I would reject it. I am not persuaded by the views of Mr. Redfern and other witnesses called by plaintiffs as opposed to the views of Mr. Gagne and other witnesses called by the USFS regarding the impact of the clearcuts on the river. While I recognize there may be discoloration and turbidity when the temporary bridge is removed, the riprap is returned to the river and the permanent bridge is put in place, this will be minor and transient given the streamside restrictions on timber harvest that have been imposed by the USFS. When deciding whether to grant injunctive relief, I am to consider the acts to be taken in conjunction with the purposes of the statute which allegedly will be contravened. *Amoco Production Co. v. Village of Gambell*, —— U.S. ——, 107 S.Ct. 1396, 1403, 94 L.Ed.2d 542 (1987). The purpose of the Act would not be undermined by allowing completion of the bridge construction.

**BUGABOO'S COUNTERCLAIM**

Bugaboo counterclaims against Breitenbush Community, Inc. for $24,040.02 in damages. Bugaboo alleges this sum was its out-of-pocket costs attributable to activities last fall of those who opposed the sale and who sought to interfere physically with initial construction of the temporary bridge. They made their presence felt at the sale site in a manner that was thoroughly inappropriate, to put the matter charitably. A large number of arrests were made.

Bugaboo's claim rests on two legal theories: (1) tortious interference with a contract; and (2) public nuisance for which there is a private remedy.

▇ A corporation is liable in the same way as a natural person for torts committed by its agents within the scope of their authority and course of employment. The burden is on Bugaboo to show such authority in the agents of Breitenbush Community, Inc. if the corporation is to be responsible for the conduct of its agents. I find that Bugaboo has not met its burden of proof that the protesters were agents of the Breitenbush Community, Inc. acting within their authority and course of employment.

While I do not condone the actions of those who resorted to civil and criminal disobedience, I deny Bugaboo's counterclaim.

**CONCLUSION**

Having considered all the testimony and reviewed the superabundance of exhibits, I deny plaintiffs' motion for summary judgment. The motions for summary judgment by USFS and Bugaboo are granted. Bugaboo's counterclaim is denied. Should the 9th Circuit Court of Appeals determine there is a genuine issue as to a material fact, then this opinion shall constitute findings of fact and conclusions of law under Fed.R.Civ.P. 52.

IT IS SO ORDERED.