The **CONFEDERATED TRIBES OF SILETZ INDIANS OF OREGON, Plaintiff,**

v.

**UNITED STATES of America; United States Department of the Interior; Manuel Lujan, Jr., Secretary of the Department of the Interior; Dr. Eddie Brown, Assistant Secretary of the Department of the Interior for Indian Affairs; and Tom Sansonetti, Solicitor for the Department of the Interior, Defendants,**

and

**The State of Oregon and Governor Barbara Roberts, Defendants–Intervenors.**

Civ. No. 92–1621–BU.

United States District Court, D. Oregon.

Jan. 21, 1994.

Craig J. Dorsay, Meyer & Wyse, Portland, OR, for plaintiff.

Myles E. Flint, Deputy Asst. Atty. Gen., Jack C. Wong, U.S. Atty., Edward J. Passarelli, General Litigation Section, Environmental and Natural Resources Div., Dept. of Justice, Washington, DC, for defendants.

Theodore R. Kulongoski, Atty. Gen. of Oregon, Virginia L. Linder, Sol. Gen., Michael D. Reynolds, Asst. Atty. Gen., Salem, OR, for defendants-intervenors.

## AMENDED OPINION AND ORDER

JAMES M. BURNS, Senior District Judge.

### INTRODUCTION

This case calls upon me to become a gaming master[1] and, as part of that task, to distinguish why gambling can be a godsend for the Grand Ronde, an economic boon for the Cow Creek and Coquille, but seriously detrimental, if not fatal, for the Siletz Tribes.[2]

For a score of years, I have been importuned to be a forest master, see *Oregon Natural Resources Council, Inc. v. United States Forest Service*, 659 F.Supp. 1441 (D.Or.1987); a herbicide master, see *Northwest Coalition for Alternatives to Pesticides v. Lyng*, 673 F.Supp. 1019 (D.Or.1987); a range master, see *Natural Resources Defense Council, Inc. v. Hodel*, 624 F.Supp. 1045 (D.Nev.1985); a prison master, see *Capps v. Atiyeh*, 559 F.Supp. 894 (D.Or. 1983); a freeway master, see *Southeast Legal Defense Group v. Adams*, 436 F.Supp. 891 (D.Or.1977); a dog master, see *Bowlin v. Deschutes County*, 712 F.Supp. 803 (D.Or. 1988); and so on and so on. I find, however, I am able to refuse the offer to assume this latest grandiose role.

### PROCEDURAL HISTORY

The Confederated Tribes of Siletz Indians of Oregon (Siletz Tribes) filed two motions for summary judgment (# 7, # 42) in which they seek reversal of the decision made by the Department of Interior (DOI) denying the Siletz Tribes' request to have land placed in trust for the purpose of establishing a gaming operation pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.* (1988). The State of Oregon and Governor Barbara Roberts[3], who were permitted to intervene as defendants on January 22, 1993, filed a Cross Motion for Summary Judgment (# 26) in which they seek this court's declaration that 25 U.S.C.

---

1. Some might say it was clever of Congress to choose the word "gaming," a prissy word no doubt intended to create the vision of a gentleperson's sport or perhaps to elicit a response similar to that aroused by such "All–American" pursuits as baseball, football, etc.; in any case, the choice of words was surely intended to avoid the "gamier" connotations evoked by the word "gambling."

2. I have been, fortunately or unfortunately, asked to decide the issues at hand without the benefit of guidance from the "Gaming Think Tank" planned by the new National Indian Gaming Institute, College of the Menominee Nation, Keshena, Wisconsin. *See The Wall Street Journal*, Jan. 13, 1994, at A1.

3. For convenience, the State of Oregon and Governor Roberts will be referred to hereinafter as "the State" except those times when a distinction is significant.

§ 2719(b)(1)(A) is constitutional or, in the alternative, that § 2719(b)(1)(A) must be severed in its entirety from IGRA.

Although the Siletz Tribes and the State agree no triable issues of fact exist and thus frame their respective requests for relief as motions for summary judgment, they actually seek declaratory relief. *See* Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* (1988). Declaratory relief is appropriate when "a judgment will clarify and settle the legal relations at issue and . . . will afford relief from the . . . controversy giving rise to the proceedings." *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency*, 966 F.2d 1292, 1299 (9th Cir.1992) (citing *McGraw–Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339, 342 (9th Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966)). Declaratory relief rests within this court's discretion and may be exercised in the public interest. *Dexter v. Kirschner*, 984 F.2d 979, 982 (9th Cir.1992). "A request for declaratory relief in a challenge to an agency action is ripe for review if the action at issue is final and the questions involved are legal ones." *Natural Resources Defense Council, Inc.*, 966 F.2d at 1299. In the matter before me, the DOI's action is final and the issues are legal; therefore, I find the requests for declaratory relief made by the Siletz Tribes and the State are appropriate.

## BACKGROUND

In March 1992, the Siletz Tribes approached the Siletz Agency, Bureau of Indian Affairs (BIA),[4] with a proposition to take into trust (i.e., to convert off-reservation land in fee to land in trust to be held by the United States for the benefit of the Siletz Tribes) a 16–acre tract in Salem, Oregon, located 50 miles from the reservation for the purpose of establishing and operating a $7 million casino pursuant to the provisions of 25 U.S.C. § 2719(b)(1)(A). The Siletz Agency requested comments on the proposal from Marion

County and the City of Salem. On April 20, 1992, Governor Roberts submitted a Consultation Report to Manuel Lujan, Secretary of DOI (for convenience, "the Secretary" and "the DOI" will be used interchangeably), in which she stated she opposed the Siletz Tribes' proposition because it would not be in the interests of the City of Salem, the County of Marion, or the State of Oregon.

In June 1992, the Siletz Tribes submitted a formal application to the Siletz Agency. In July 1992, the Siletz Agency recommended approval of the Siletz Tribes' application and forwarded the proposal to the Portland Area Office. The Portland Area Office recommended approval and forwarded the proposal to the Central Office. In September 1992, the Central Office returned the application to the Portland Area Office for supplementation. Pursuant to the requirements of § 2719(b)(1)(A), the Siletz Agency Superintendent then requested Marion County, the City of Salem, the Governor, and local tribes to comment further as to whether the proposed off-reservation gaming operation would be in the best interests of the Siletz Tribes and whether such an operation would be detrimental to the surrounding community. In October 1992, the Governor responded directly to Dr. Eddie Brown, Assistant Secretary, BIA, and stated the proposed gaming operation would be detrimental to the surrounding community. In spite of the Governor's comments, the Portland Area Office again recommended approval and forwarded the application to the Central Office.

On November 6, 1992, the Secretary issued findings concluding the proposal was in the best interests of the Siletz Tribes and would not be detrimental to the community. The Secretary also addressed the comments and objections of the City of Salem, the County of Marion, the Governor on behalf of the State, and neighboring tribes. The Secretary then asked the Governor to concur with the DOI's determination in favor of granting

---

4. The BIA has three administrative levels: the Agency Office, the Area Office, and the Central Office in Washington, D.C. According to the BIA, approximately 87 agency offices represent tribes or confederations of tribes; the Siletz Tribes are represented by the Siletz Agency.

Fee-to-trust requests are initially submitted to the Agency Office, processed through the Area Office, and finally approved or denied at the Central Office under the authority of the Secretary.

the Siletz Tribes' application; the Governor refused. In December 1992, the DOI denied the Siletz Tribes' application because, in its opinion, an exception to § 2719(a) could not be granted without the Governor's concurrence.

## ISSUES

1. Whether 25 U.S.C. § 2719(b)(1)(A) requires the DOI to obtain the Governor's concurrence before it can convert off-reservation land fee-to-trust for the purpose of establishing a gaming operation for the benefit of an Indian tribe.

2. If § 2719(b)(1)(A) requires the DOI to obtain the Governor's concurrence, whether that requirement is constitutional under the Appointments Clause (Article II, Section 8, Clause 17 of the United States Constitution), general separation-of-powers principles, the Fifth Amendment, and the Tenth Amendment.

3. If § 2719(b)(1)(A) unconstitutionally requires the Governor's concurrence, whether the provision requiring same is severable from § 2719(b)(1)(A).

## DISCUSSION

The Siletz Tribes contend the DOI's denial of their application for an exception to § 2719(a) should be reversed and remanded for reconsideration because the decision was based on the DOI's erroneous conclusion that the Governor's concurrence is mandatory under § 2719(b)(1)(A). The Siletz Tribes assert the Governor's role is merely advisory. If this court determines that § 2719(b)(1)(A) dictates the DOI's decision is subject to the Governor's concurrence, the Siletz Tribes contend the offending portion of the statute violates the Appointments Clause, general separation-of-powers principles, the Fifth Amendment, and the Tenth Amendment and, therefore, must be excised.

Defendants ask this court to find the provision requiring the Governor's concurrence constitutional; if I find otherwise, however, the State asserts § 2719(b)(1)(A) must be severed in its entirety from IGRA.

At the heart of this action lie the following statutes:

25 U.S.C. § 2719(a) prohibits the establishment of gaming operations on off-reservation lands acquired in trust by the DOI for the benefit of an Indian tribe after October 17, 1988, except under certain conditions that are irrelevant to the particular issues brought to this court by the Siletz Tribes. 25 U.S.C. § 2719(b)(1)(A) provides the following exception to the prohibition of § 2719(a):

(1) Subsection (a) of this section will not apply when

(A) the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination . . . .

## STATUTORY CONSTRUCTION

### a. DOI's conduct.

The Siletz Tribes contend the DOI's conduct up to the time of its final decision indicates the DOI viewed the Governor's concurrence or nonconcurrence as merely advisory. The Siletz Tribes point out their application received favorable findings at every administrative level: (1) after the Governor's initial rejection of the proposal, the Secretary issued findings concluding the proposal was in the best interests of the Siletz Tribes and not detrimental to the surrounding community; (2) high-level DOI officials stated the Governor's concurrence was not a prerequisite for approval (see affidavit of Kerry Barnett, ¶¶ 3–4); and, (3) the DOI tentatively approved the Siletz Tribes' application in the face of the Governor's objections.

Unfortunate as it may seem, the DOI's conduct does not determine statutory construction nor does it shed light on the question of a statute's constitutionality. The Siletz Tribes' reliance on the DOI's conduct to

support their interpretation of § 2719(b)(1)(A) is ill-founded.[5]

b. *Meaning of § 2719(b)(1)(A).*

■ The Siletz Tribes argue § 2719(b)(1)(A) can and should be construed as giving the Governor no more than an advisory role while preserving the Secretary's ultimate authority over the decision whether to grant an exception to § 2719(a); therefore, the DOI's denial of the Siletz Tribes' application, which was based solely on the DOI's erroneous interpretation of the Governor's role, should be reversed and remanded for reconsideration under the correct application of the law.

Section 2719(b)(1)(A) mandates the sequence of steps required before an exception to § 2719(a) can be granted: (1) the tribe must apply for an exception; (2) the Secretary must consult with the tribe, other local tribes, local officials, and state officials; (3) the Secretary must determine whether a gaming operation on the newly-acquired land would be in the best interests of the tribe and whether it would be detrimental to the surrounding community; and (4) if the Secretary's determination is favorable, the Secretary must obtain the Governor's concurrence before an exception can be granted. The statute permits an exception to the prohibition of § 2719(a) only if all steps are satisfied.

Oliver Wendell Holmes, Jr., once stated, "We do not inquire what the legislature meant; we ask only what the statute means." *Theory of Legal Interpretation,* 12 Harv. L.Rev. 417, 419 (1899). *See also Connecticut Nat'l Bank v. Germain,* — U.S. —, —, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there"). Section

2719(b)(1)(A) permits the DOI to grant an exception to § 2719(a), "but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's [favorable] determination." The final step of obtaining the Governor's concurrence is an integral part of the process under § 2719(b)(1)(A); in fact, the "but only if" restrictive language precludes the Secretary from granting an exception to § 2719(a) without satisfying this final step. If the restrictive language were eradicated, the Governor's role would indisputably be advisory; the statute, however, makes no bones about the necessity of the Governor's concurrence.

I find the straightforward language of § 2719(b)(1)(A) leaves little room for misinterpretation.[6] When Congress's "will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels,* — U.S. —, — – —, 113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457 (1993) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3249–50, 73 L.Ed.2d 973 (1982)). I find the language of § 2719(b)(1)(A) is unmistakably plain and, therefore, conclusive: If the Secretary cannot obtain the Governor's concurrence, the Secretary's determination in favor of granting an exception dies. I, therefore, hold that the Governor's concurrence is mandatory under § 2719(b)(1)(A) and that the Governor has, in effect, final authority over the grant of an exception to § 2719(a).

In light of the foregoing, an examination of secondary materials to determine Congress's intent is unnecessary. I note, however, Assistant Attorney General John R. Bolton's reaction to an earlier form of the law that eventually became § 2719(b)(1)(A). Mr. Bolton advised the senate committee that this section of IGRA would violate the Appointments Clause if it were dependent upon the

---

**5.** The Siletz Tribes do not claim they acted to their detriment in reliance on the DOI's conduct.

**6.** The argument that the unambiguous language of § 2719(b)(1)(A) means something other than its plain meaning is grounded in what I call the "Humpty Dumpty approach" to language: " 'There's glory for you!' 'I don't know what you mean by glory,' Alice said. Humpty Dumpty smiled contemptuously. 'Of course you don't—

till I tell you....' 'When I use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean, neither more nor less.' 'The question is,' said Alice, 'whether you can make words mean so many different things.' 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.' " Lewis Carroll, *Through the Looking Glass* 198 (Julian Messner ed. 1978) (1871).

concurrence of the Governor, the state legislature, and/or the county or municipality in which such lands were located. S.Rep. No. 446, 100th Cong., 2d Sess. 32 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3102. To avoid the inherent constitutional problems that would crop up if individuals who were not appointed in accordance with the Appointments Clause were permitted to waive a federal statute, Mr. Bolton recommended Congress include language that clearly indicated the DOI would have ultimate authority to grant an exception. Mr. Bolton specifically suggested the provision begin with the words "Subject to the approval of the Secretary." *Id.* If Congress had heeded Mr. Bolton's counsel and crafted an exception in which the DOI clearly had final authority to grant or to deny an exception to § 2719(a), we might not be here today.

c. *Compatibility of §§ 2719(b) and (c).*

■ The Siletz Tribes further argue §§ 2719(b) and (c) taken together are ambiguous and should, therefore, be liberally construed in favor of the Siletz Tribes.

"[A]mbiguities in federal statutes dealing with Indians are to be resolved favorably to the Indians." *United States v. Ferry County,* 511 F.Supp. 546, 550 (E.D.Wash.1981) (citing to *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 660 (9th Cir. 1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977)).[7] The court in *Ferry County* noted, however, this liberal construction "does not require a strained reading of the statute." 511 F.Supp. at 550.

Section 2719(c) provides "[n]othing in this section shall affect or diminish the authority of the Secretary to take land into trust."

---

**7.** The Siletz Tribes also turn to *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), to support their argument that § 2719(b)(1)(A) must be liberally construed in their favor. In *Cabazon,* however, the Supreme Court addressed the enforceability of state laws on Indian reservations in light of competing state, federal, and tribal interests. Here I do not have the task of determining which sovereignty has the most compelling interest.

**8.** The Siletz Tribes alternatively challenge § 2719(b)(1)(A) on the ground that requiring the

---

The Siletz Tribes contend § 2719(c) clearly confers ultimate authority to the Secretary to grant the exception provided for in § 2719(b)(1)(A).[8] I disagree. Section 2719(b)(1)(A) gives the Secretary authority, subject to the Governor's concurrence, to take off-reservation land into trust for the specific purpose of establishing a gaming operation for the benefit of an Indian tribe. Section 2719(c) merely ensures that the Secretary's general authority to take off-reservation land into trust for the benefit of an Indian tribe remains undiminished.[9] In light of the foregoing, I find §§ 2719(b) and (c) are neither ambiguous nor incompatible.

*TENTH AMENDMENT*

If the Governor's concurrence is viewed as mandatory, the Siletz Tribes further contend such a requirement would, in effect, "command" the Governor to participate in a federal decision in violation of the Tenth Amendment. *See New York v. United States,* — U.S. —, —, 112 S.Ct. 2408, 2435, 120 L.Ed.2d 120 (1992) ("Federal Government may not compel the States to enact or administer a federal regulatory program"). *See also Board of Natural Resources v. Brown,* 992 F.2d 937 (9th Cir.1993).

■ The Tenth Amendment provides "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." In *Board of Natural Resources,* the Ninth Circuit addressed the limitations imposed on Congress by the Tenth Amendment and held unconstitutional a statute requiring the State of Washington to issue regulations to carry out a federal ban on the export of logs from public lands. *Id.* at 946–47. Although Con-

---

State's approval to the conversion of land in fee to land in trust for the purpose of establishing a gaming operation for the benefit of an Indian tribe amounts to an unconstitutional limitation on preexisting sovereign tribal authority over trust lands; however, I find my analysis of the meaning and constitutionality of the statute does not require me to reach this issue.

**9.** No party argues that establishment of a gaming operation is the only reason to convert off-reservation land from fee to trust for the benefit of an Indian tribe.

gress has the authority "to pass laws requiring or prohibiting certain acts," the court pointed out that the Tenth Amendment limits "Congress's power to use the states as implements of regulation" and prohibits Congress from directly compelling " 'the States to require or prohibit those acts' " or " 'to enact and enforce a federal regulatory program.' " *Id.* (quoting *New York v. United States,* ── U.S. at ── ── ──, 112 S.Ct. at 2420–23). The Tenth Amendment, in effect, prohibits the federal government from infringing on the States' legislative power except as otherwise constitutionally permitted.

■ Section 2719(b)(1)(A) demands nothing of the Governor; all of the burdens imposed by the statute rest with the DOI. The Governor, in fact, independently exerts power on behalf of the State even through inaction: The Governor, by doing nothing, can defeat the DOI's determination in favor of granting a tribe's application for an exception to § 2719(a). Section 2719(b)(1)(A) does not infringe on the State's legislative power; therefore, I do not find merit in the Siletz Tribes' Tenth Amendment argument.

### APPOINTMENTS CLAUSE AND SEPARATION OF POWERS

If the Governor's concurrence is mandatory, the Siletz Tribes further assert the statutory requirement is unconstitutional and violates the Appointments Clause [10] and general separation-of-powers principles. Defendants argue § 2719(b)(1)(A) does not violate the Appointments Clause because the Governor is not an appointee as defined under *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d

659 (1976). Defendants further contend the requirement of the Governor's concurrence does not breach separation-of-powers principles.

*Appointments Clause*

■ Defendants argue the Appointments Clause does not apply to § 2719(b)(1)(A) because the Governor does not qualify as a federal appointee under the *Buckley* test. Under *Buckley,* the Appointments Clause applies to (1) all executive or administrative officers, (2) who serve pursuant to federal law, and (3) who exercise significant authority over federal government actions. 424 U.S. at 123–27, 96 S.Ct. at 684–86. *See also Seattle Master Builders Ass'n v. Pacific N.W. Elec. Power,* 786 F.2d 1359, 1365 (9th Cir.1986), *cert. denied,* 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987).[11] In *Buckley,* the Supreme Court found "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed" in the manner prescribed by the Appointments Clause. 424 U.S. at 126.

Under § 2719(b)(1)(A), the Governor was not appointed by the Executive Branch nor was the Governor an inferior federal officer properly appointed by Congress "to carry out appropriate legislative functions." *Buckley,* 424 U.S. at 128, 96 S.Ct. at 686. As explained more fully in the separation-of-powers section below, however, Congress, in effect, unconstitutionally empowered the Governor to act as if she were an officer of the United States appropriately appointed by Congress to "serve" pursuant to federal statute and to exercise significant authority over

---

**10.** The pertinent part of the Appointments Clause, Article II, Section 8, Clause 17 of the United States Constitution, provides:

.... He [the President] shall ... appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

**11.** Although the parties cite to *Seattle Master Builders Ass'n,* each for their own purposes, the issues differ from those brought before this court.

In *Seattle Master Builders Ass'n,* a group of home builders asserted the authority granted by Congress to the Pacific Northwest Electric Power and Conservation Council was unconstitutional and violated the Appointments Clause because the council exercised "significant authority over the federal government" even though members were not appointed by the President. 786 F.2d at 1362–63. The Ninth Circuit concluded the Appointments Clause was not violated. The court reasoned that council members were not officers of the United States within the meaning of *Buckley* because members performed their duties pursuant to the Interstate Compact Clause requiring both state legislation and congressional approval. *Id.*

federal government actions through a congressional grant of power.

*Separation of Powers*

Defendants also argue the doctrine of separation of powers as reflected in the Appointments Clause only forbids Congress to retain or to enlarge its power over executive authority. Defendants conclude, therefore, the Siletz Tribes' contention that § 2719(b)(1)(A) violates the Appointments Clause is erroneous because the statute does not enlarge Congress's power. Defendants also argue the requirement of the Governor's concurrence equates to "contingent" legislation [12] rather than veto power over the Secretary's determination; therefore, defendants contend § 2719(b)(1)(A) does not violate general separation-of-powers principles.

■ General separation-of-powers principles are exemplified in the delegation and separation of powers inherent in the structure of Articles I, II (which includes the Appointments Clause), and III. *INS v. Chadha*, 462 U.S. 919, 946, 103 S.Ct. 2764, 2781–82, 77 L.Ed.2d 317 (1983). The Appointments Clause specifically addresses separation of powers between Congress and the Executive Branch. *See Buckley*, 424 U.S. at 124–32, 96 S.Ct. at 684–88. The core concern of the Appointments Clause is to ensure that executive power remains independent. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 722–27, 106 S.Ct. 3181, 3186–88, 92 L.Ed.2d 583 (1986) (Congress may not encroach on the authority of the Executive Branch by exercising removal power over an officer performing Executive Branch functions). In *Mistretta v. United States*, the Supreme Court noted efforts to contain "encroachment and aggrandizement" by a single Branch has animated the Court's separation-of-powers jurisprudence. 488 U.S. 361, 382, 109 S.Ct. 647, 660, 102 L.Ed.2d 714 (1989). The Court further observed that it has "not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches *or that undermine the authority and independence of one or another coordinate Branch.*" *Id.* (Emphasis added). *See also United States v. The Boeing Co.*, 9 F.3d 743, (9th Cir.1993).[13]

In *Chadha*, the Supreme Court demonstrated its concern for the independence of the Executive Branch when it carefully constrained Congress's efforts to usurp executive power. Congress had given itself a one-house legislative veto over deportation decisions made by the United States Attorney General. The Supreme Court held the one-house legislative-veto portion of the statute unconstitutional and pointed out that neither the House of Representatives nor the Senate unilaterally had the power to require "the Attorney General to deport an alien once the Attorney General, in the exercise of legislatively delegated authority" made a determination. 462 U.S. at 952–53, 103 S.Ct. at 2784–85. In delegating to one house the power to veto a decision of the Executive Branch, Congress was delegating power that one house could not constitutionally exercise. *Id.* Similarly, the Siletz Tribes argue Congress delegated power to the Governor that a state official could not constitutionally exercise and, in doing so, undermined the authority and independence of the Executive Branch.

Defendants respond that the requirement of the Governor's concurrence is not extraordinary or unconstitutional as illustrated by the fact that (1) Congress has frequently delegated power to the states to approve legislation as a condition precedent to operation or implementation of a statute, (2) the Supreme Court on several occasions has sustained congressional enactments subjecting federal agencies to the operation of state law and determinations of state administrative agencies, and (3) the federal government has agreed in the past to submit to state law in several areas. *See, e.g., Currin v. Wallace*, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939)

---

12. "Contingent" legislation refers to statutes that initially take effect or are implemented by the action of individuals or entities outside the federal government. *See, e.g., Currin v. Wallace*, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939).

13. The ever-cautious reader should be aware that *Boeing* was initially filed September 7, 1993, and radically amended (omission of 3+ pages) less than two months later. 9 F.3d 743 (9th Cir. 1993).

(the Secretary of Agriculture can only designate markets for the auction of tobacco that have been approved by a referendum of two-thirds of tobacco growers); *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978) (federal dam subject to regulation by state water resources agency); *Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (federal facility subject to state air pollution regulations); *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (state utility commission administered federal regulations regarding utility rate structures and cogeneration). Unlike Congress's mandate in § 2719(b)(1)(A), however, these cases generally involve (1) state agencies or appointees administering state regulatory programs based on state law that governs the legal rights and obligations of state residents, (2) interstate compacts that affect the federal sphere, or (3) joint federal and state action. *See Seattle Master Builders Ass'n*, 786 F.2d at 1362–65.

■ Here we are not faced with a requirement that a federal agency follow the laws, regulations, and policies set by a state, *see, e.g., Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976); we are not faced with legislation that permits states to appoint council members to regulate activities under a compact between federal and state governments, *see, e.g., Seattle Master Builders Ass'n;* we are not faced with legislation that might constitutionally permit a state to act as an agent under the Appointments Clause, *see United States, ex rel. Truong v. Northrop Corp.*, 728 F.Supp. 615, 623 (C.D.Cal.1989); and we are not faced with "contingent legislation" that initially takes effect or is implemented by the action of individuals or entities outside the federal government, *see Currin v. Wallace*, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939). Instead we have a statute in which Congress delegates to a state official the power to veto a favorable determination by an official of the Executive Branch who was legislatively charged with making that determination. In other words, we have "an act of Congress [that] arguably threatens the integrity of another branch's authority and independence" and impermissibly undermines the role of that branch. *United States v. The Boeing Co.*, 3 F.3d 743, 750 (citing *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 856, 106 S.Ct. 3245, 3259–60, 92 L.Ed.2d 675 (1986)).

In *United States v. Ferry County*, the district court also confronted issues under the Appointments Clause arising from a statute that required the consent of local authorities to federal action. In § 2 of the Colville Restoration Act of 1956 (Act) (PL 84–772, 70 Stat. 626), the Secretary was authorized to acquire non-Indian lands for the benefit of Indian tribes but only after obtaining consent from the commissioners of counties in which the land was located. The legislative rationale for first obtaining the county commissioners' consent was that the acquisitions of non-Indian land for the benefit of Indian tribes would remove that land from the county tax rolls. 511 F.Supp. at 551. The district court held the consent provision did not violate general principles of separation of powers nor, specifically, the Appointments Clause because the statute was inoperative unless the commissioners first passed a resolution consenting to the acquisitions. *Id.* at 550–52. In the Act, Congress imposed no prerequisites or standards to be met by the DOI before purchasing non-Indian lands nor was the DOI charged with a legislative directive to make a determination that could be overruled by the county commissioners, *see id.* at 550; in fact, the DOI was a passive participant in the statutory scheme.

In contrast, § 2719(b)(1)(A) delineates in detail the conduct and procedure the DOI must follow when a tribe applies for an exception to § 2719(a). The statutory prerequisites require the DOI to consider the views of state and local interests. The Governor's concurrence or nonconcurrence does not trigger operation of § 2719(b)(1)(A) nor does it initiate the DOI's consideration of the legislatively-mandated factors that are required before the DOI can grant an exception. Instead § 2719(b)(1)(A) requires a discretionary administrative determination by the DOI that includes consideration of the Governor's views and then grants the Governor the power to negate the DOI's determination if it is favorable.

I find no authority that holds Congress can delegate to a state official the power to nullify a determination by a federal agency legislatively charged with making that determination. In fact, a principal purpose of the Constitution was to eliminate a fundamental weakness in the Articles of Confederation that required the Confederacy to obtain the states' consent for every important federal action. *Federalist Papers No. 15* (Hamilton). The framers of the Constitution, in their wisdom, perceived there would have been little prospect of federal measures being executed if the federal government could not "carry its agency to the persons of the citizens" without the "intermediate" assent of the states. *Federalist Papers No. 16* (Hamilton).

In § 2719(b)(1)(A), Congress did not directly arrogate to itself a power that would otherwise be exercised by the Executive Branch; Congress, however, encroached upon and undermined the authority of the Executive Branch when it required the DOI to make a determination under certain circumstances, set the standards for the DOI's determination (to include consideration of the Governor's views), and then enfranchised the Governor with the power to kill the DOI's determination if it were favorable. Congress unconstitutionally delegated to a state official, who was not a properly appointed federal officer as defined by *Buckley*, the power to overrule a determination that would otherwise have been exercised solely by an agency of the Executive Branch, power that an individual house of Congress could not unilaterally exercise, *see Chadha*, 462 U.S. at 952–53, 103 S.Ct. at 2784–85, and power that a state official could not constitutionally exercise.[14]

In summary, I find Congress violated the Appointments Clause and general separation-of-powers principles when it granted a state governor veto power over a discretionary determination made by an agency of the Executive Branch legislatively charged with making that determination; therefore, the

provision of § 2719(b)(1)(A) that grants veto power to the Governor is unconstitutional.

*FIFTH AMENDMENT*

If the Governor's concurrence is determined to be mandatory, the Siletz Tribes also argue that § 2719(b)(1)(A) violates the Siletz Tribes' due process rights under the Fifth Amendment because the statute (1) delegates Executive authority to a state governor in spite of the State's inherent conflict of economic interest and (2) fails to provide a process for challenging the governor's decision. Since I have found § 2719(b)(1)(A) unconstitutional on other grounds, I find it unnecessary to reach the Siletz Tribes' Fifth Amendment argument.[15]

*SEVERABILITY*

Finally, the Siletz Tribes argue that even if the provision requiring the Governor's concurrence is unconstitutional, the remedy is to sever that provision and to permit the constitutional portion of the statute to operate as law; the State, in turn, contends the remedy is to sever § 2719(b)(1)(A) in its entirety.

■ Section 2721 of IGRA provides:

In the event that any section or provision of this chapter ... is held invalid, it is the intent of Congress that the remaining sections or provisions of this chapter ... shall continue in full force and effect.

The presence of a severability clause creates a presumption that "the objectionable provision can be excised from the remainder of the statute" unless strong evidence indicates Congress intended otherwise. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987). The two-part test is (1) whether the statute would be "functionally independent" after excision of the unconstitutional provision and (2) whether the surviving portion of the statute would function independently in a manner consistent with the intent of Congress. *Board of Natural Resources*, 992 F.2d at 948.

14. Congress may be able to delegate its power to an independent agent, *see Bowsher*, 478 U.S. at 753, 106 S.Ct. at 3201–02; however, I find no authority that permits Congress to grant an independent agent veto power over a determination made by an agency of the Executive Branch.

15. The parties have indicated an appeal will follow regardless of the outcome; therefore, none of the parties' arguments are, in reality, foreclosed since the appellate court will review the record *de novo*.

a. *Whether the surviving portion of the statute would function independently after excision.*

 If elimination of the unconstitutional portion of an act "in no way alters the substantive reach of the statute and leaves completely unchanged its basic operation," the act is "functionally independent." *Id.* (citing *United States v. Jackson,* 390 U.S. 570, 586, 88 S.Ct. 1209, 1218–19, 20 L.Ed.2d 138 (1968)). A statute is, in other words, functional if the court does not have to rewrite the law to allow it to operate independently. *Alaska Airlines, Inc.,* 480 U.S. at 684, 107 S.Ct. at 1479–80.

 I find neither IGRA nor § 2719 would be substantively altered by excision of the unconstitutional portion of § 2719(b)(1)(A). I also find elimination of the unconstitutional portion of § 2719(b)(1)(A) would not substantively affect the functional independence of the constitutional portion. In other words, the constitutional portion of § 2719(b)(1)(A) could continue to operate effectively as an exception to the prohibition of . § 2719(a): The Secretary would still be required to consult with the tribe, appropriate state and local officials, and other local tribes before determining whether fee-to-trust conversion of off-reservation lands for the purpose of establishing a gaming operation was in the tribe's best interests and would not be detrimental to the surrounding community.

b. *Whether the surviving portion of the statute would function independently in a manner consistent with the intent of Congress.*

 As Governor Roberts pointed out in her letter to the DOI dated April 20, 1992, § 2719(b)(1)(A) reflects Congress's intention to ensure "state public policy play[s] a . . . critical role in determining whether new lands [i.e., off-reservation land] should be acquired for gambling purposes." Courts have acknowledged state interests are of greater weight when the circumstances involve tribal activities conducted outside the reservation. *See Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270–71, 36 L.Ed.2d 114 (1973). *See also Organized Village of Kake v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 570–71, 7 L.Ed.2d 573 (1962).

Section 2719(a) clearly sets forth a general federal policy of prohibiting fee-to-trust conversions of off-reservation land for the purpose of establishing gaming operations for the benefit of Indian tribes. In § 2719(b)(1)(A), Congress tempered the absolute nature of its prohibition by giving the DOI authority to consider exceptions and by dictating a procedure the DOI must follow when considering such exceptions. By directing the Secretary to first consult with appropriate state and local officials and by requiring the Secretary to determine whether an off-reservation gaming operation would be detrimental to the surrounding community, Congress ensured state public policy together with other local interests would be an important part of the equation. Congress went a step further, however, and granted the Governor veto power over a favorable determination by the Secretary.

Although § 2719(b)(1)(A) could have been written many ways, the statute before me is the statute Congress enacted. I do not intend to second guess Congress's intentions beyond those expressed in the statute nor do I intend to speculate as to "what might have been" if the statutory language were shifted slightly.[16] As stated earlier, the meaning of

**16.** The difference between the language used and the writer's intended meaning may seem like a mere matter of semantics; however, as Mark Twain pointed out, "the difference between the *almost right* word[s] and the *right* word[s] is really a large matter—'tis the difference between the lightning-bug and the lightning." Letter from Mark Twain to George Bainton (Oct. 15, 1888), *in The Art of Authorship* at 87–88 (George Bainton ed.) (1890).

Lest anyone remain perplexed as to how Congress could have carved an exception to § 2719(a) that would have eluded constitutional problems while retaining the prominence of state interests, I offer the following possibilities: (1) Congress could have structured an exception that was triggered by approval of the Governor, the state legislature, other local tribes, and the city and county in which the land was located but subject to final approval by the DOI; or (2) Congress could have required the Governor's approval after consideration of comments from the state legislature, other local tribes, and the

§ 2719(b)(1)(A) is unmistakably clear: Congress made the state's interests paramount by granting the Governor veto power over the DOI's determination. Absent the unconstitutional portion of § 2719(b)(1)(A), the DOI would still be required to consider the views of local tribes and state and local officials; however, the DOI could reject those views. In effect, if only the constitutional portion of the statute were preserved, the state's interest would no longer be paramount as Congress apparently intended. Accordingly, I conclude mere excision of the unconstitutional provision present in § 2719(b)(1)(A) would not satisfy the two-part test set forth in *Board of Natural Resources* because the surviving portion of the statute would not function independently in a manner consistent with the apparent intent of Congress. I, therefore, hold § 2719(b)(1)(A) must be severed in its entirety from IGRA.

### CONCLUSION

Based on the foregoing, I find § 2719(b)(1)(A) violates the Appointments Clause and general separation-of-powers principles because it unconstitutionally grants a state official veto power over a determination made by an agency of the Executive Branch legislatively charged with making such a determination. I also find the constitutional portion of § 2719(b)(1)(A) would not function independently in a manner consistent with the apparent intent of Congress and, therefore, § 2719(b)(1)(A) must be severed in its entirety from IGRA. Accordingly, the motions for summary judgment filed by the Siletz Tribes and the State are PARTIALLY GRANTED and PARTIALLY DENIED; the Siletz Tribes' request for reversal and remand of the DOI's decision is DENIED.

IT IS SO ORDERED.

city and county in which the land was located subject to final approval by the DOI.